[Crim. No. 2139. Fourth Dist., Div. Two. Mar. 7, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. JAMES J. POTTER et al., Defendants and Appellants.

Heinly, Hewett, Rickles & Heinly and William A. Dougherty for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and James H. Kline, Deputy Attorney General, for Plaintiff and Respondent.

KERRIGAN, J.—The record discloses that on April 17, 1964, an information was filed in the Orange County Superior Court charging the two defendants in three counts of violation of Penal Code, section 640 (wiretapping), and in the fourth count of violation of Penal Code, section 182 (conspiracy).

A jury trial ensued and during the trial Count III (wiretapping) was dismissed. The jury could not agree as to Count I (wiretapping) but returned a verdict finding both defendants guilty of Counts II (wiretapping) and IV (conspiracy).

The defendants were sentenced to one year in the county jail, misdemeanors, the sentences were suspended and each defendant was placed on probation for a period of three years.

## Statement of Facts

The evidence discloses that in March 1964, there was located at Seal Beach, California, a huge housing development known as "Rossmoor Leisure World Project," which consisted of nearly 6,000 separate apartments or dwelling units. This substantial residential tract was controlled by multiple corporations. The Golden Rain Foundation was the management firm for the entire project and held title to the facilities commonly used by all of the residents, including the recreational club houses, streets, water systems and sewers. The apartments were owned by sundry mutual corporations, and the foundation had an agreement with each corporation whereby it maintained the streets, yards, grounds and recreational facilities for the benefit of all residents. Each building owned by a mutual corporation contained 12 separate apartments and every building had a common attic, access to which attic was usually gained by the use of a ladder and removal of an unlocked aluminum louvered window. In the attic there existed individual antennae for each of the 12 apartments.

Residents were advised by foundation's officers and employees not to enter the attic in their building inasmuch as

there was always the possibility of disengaging or moving someone else's antenna, and were informed that the proper procedure would be to contact the management firm for any repairs or services required to be performed in the attic area.

Each resident acquired a stock certificate in the mutual corporation which owned the building in which he resided, together with a certificate of membership in the foundation entitling him to all of the privileges of the common facilities.

Lewis Letson was the administrator of the foundation and thus was in charge of all the management operations of the foundation and the project. Information came to him through a local city official to the effect that it might be well to conduct an investigation of one of the residents of the project, Lloyd Gummere. Letson retained a licensed private investigator, the codefendant Wolfe, to conduct an investigation in early March 1964. During their conversation, Letson informed Wolfe that he had been advised by the Seal Beach police in connection with a prior, unrelated investigation that it was possible to install a hidden microphone in the apartment of a suspect in order to obtain evidence. Under the retainer agreement, Wolfe was to be employed by the foundation for the sum of $300 per diem for a minimum of seven days. Wolfe advised Letson he would undertake the investigation, but did not inform Letson as to the specific methods he would use to obtain the information desired; however, he would have a party who would identify himself as "Mr. Evans" contact Letson in the near future.

Thereafter, on Monday, March 9, 1964, "Mr. Evans," who in reality was the codefendant Potter, visited the project and was given authorization by Letson to inspect the building where Gummere lived. One of the employees of the project was instructed to introduce Potter as a representative of a bonding company that wanted to check the roofs of some of the buildings. Later in the day, Potter was seen by several witnesses going into the common attic in Gummere's building, having gained entrance by the use of a ladder.

The following day, Gummere noticed that his television set was not functioning properly and was not receiving any picture. He turned off the set and did not engage it again until Thursday evening, when a gross distortion of the picture was observed. He particularly noted a serious impairment in reception of the visual picture whenever the telephone was in actual use, and concluded there was some relationship

between the operation of the telephone and the distortion in the television reception. Because he suspected possible wiretapping, he telephoned the city authorities and two officers were sent to his apartment. He authorized them to conduct an investigation of the premises to determine the source of the difficulty, and soon thereafter they summoned him to a telephone junction box which was located outside of the building in a compartment on the exterior wall. There they pointed out an electronics device known as a parasite radio transmitter, which was attached to the terminal lines leading to the telephone in his apartment. The door of the box was open when the officers first observed it.

The telephone junction box was owned by a mutual corporation and the telephone company had an easement for underground lines but no easement of access on mutual or foundation property.

After making this discovery, the officers departed with the electronics device intending to determine by testing whether it was functional, and as they were proceeding back to the station, they observed a dark blue 1954 Ford automobile with three antennae. After making a U-turn, they followed the Ford back towards the Leisure World Project and it stopped and parked approximately 100-150 yards from Gummere's apartment. The officers approached the vehicle and heard a loud metallic crackling sound, known as ''high frequency hash.'' The codefendants were in the car, and after the officers identified themselves, Potter made a jerking motion and the crackling noise terminated. There were three receivers in the car, but during interrogation both defendants denied any knowledge of a radio transmitter intercepting telephone messages.

The next evening, Saturday, Gummere noticed that the reception was still poor, and the police and telephone company were contacted on the subsequent Monday.

When the service employee of the General Telephone Company arrived, he found another radio transmitter in the attic connected to Gummere's telephone.

Both electronic devices were later tested, found to be operable, and identified as radio transmitters that could convey messages a distance of 1,500-2,000 feet in a 40 megacycle range.

Further investigation revealed that a piece of adhesive tape, which was removed from the parasite transmitter found in the junction box, contained a fingerprint, which latent print was later identified to be the defendant Potter's.

The police obtained a warrant for the arrest of each of the codefendants. After being taken into custody, the defendant Wolfe admitted he had been employed by Letson, and that he was operating a radio receiver approximately 150 yards from Gummere's apartment on March 13, 1964, for the purpose of trying to determine if a transmission was being made from a radio transmitter attached to a telephone line in Leisure World.

After Potter's arrest, he freely and voluntarily stated that he had been employed by Wolfe, had received a check in the sum of $150 from Wolfe for his services, and that he had been in the attic above Gummere's apartment trying to determine if someone had tapped Gummere's phone. It should be noted that neither defendant confessed to either of the crimes.

The police obtained a search warrant authorizing a seizure of the $150 check at Wolfe's bank. The codefendants were fingerprinted at the sheriff's office and voluntarily signed an acknowledgment of legal rights so that the prosecution could be conducted in Orange County and not in Los Angeles County. Potter's fingerprint identification card was compared with the latent print on the adhesive tape removed from the junction box, and Potter's signature on both the original fingerprint card and on the acknowledgment of legal rights document were compared with the endorsement on the check issued by Wolfe to Potter, and by the use of such exemplars, were identified as Potter's endorsement on the check.

During the trial, the court denied defendants' motion to suppress the introduction in evidence of the two radio transmitters and the adhesive tape, granted the prosecution's motion to amend Count II of the information to include the words ''wilfully, unlawfully, feloniously and fraudulently,'' refused to permit the information, as amended, to be taken to the jury room after the jury requested the same, allowed the introduction of defendants' extrajudicial statements, and both the court and prosecutor commented on the defendants' failure to testify.

### Issues Raised on Appeal

Defendants raise the following issues on appeal:

1. That California Penal Code, section 640 (wiretapping), is unconstitutional inasmuch as Congress has preempted the field of electronic communications;

2. That Penal Code, section 640, is unconstitutional in that it constitutes an ex post facto statute;

3. That defendants have an absolute constitutional right to be indicted by a grand jury;

4. That evidence was introduced which was obtained as a result of an illegal search and seizure;

5. That the comment of the district attorney and the court's instruction on defendants' failure to testify violated defendants' constitutional right against self-incrimination;

6. That defendants' extrajudicial statements should not have been admitted in evidence;

7. That the defendants were placed in "double jeopardy" because of the order authorizing the district attorney to amend the information during the course of the trial;

8. That the defendants were prejudiced by the court's refusal to permit the jury to view the information in the jury room;

9. That the court erred in its instructions of law.

### Constitutionality of Penal Code, Section 640 as to Preemption Issue

Penal Code, section 640, at the time here involved, provided as follows: "Every person who . . . wilfully and fraudulently, or clandestinely . . . makes any unauthorized connection with any . . . telephone wire . . . or instrument under the control of any . . . telephone company; or who wilfully and fraudulently, or clandestinely, or in any unauthorized manner . . . to learn the contents or meaning of any message . . . while the same is . . . passing over any . . . telephone wire . . . is punishable by imprisonment in the state prison not exceeding five years, or by imprisonment in the county jail not exceeding one year. . . ."

The Federal Communications Act (47 U.S.C.A. § 605) provides, *inter alia,* as follows: ". . . no person not being authorized by the sender shall intercept any communication and divulge or publish the . . . contents . . . or meaning of such intercepted communication to any person. . . ."

The preemption issue in the field of wiretapping has apparently never been decided by the U. S. Supreme Court or California's highest tribunal.[1] The federal wiretapping statute

---

[1]Defendants herein previously filed a petition for writ of prohibition alleging that Penal Code, section 640 was unconstitutional, which petition was denied on July 9, 1964. (*Potter et al. v. Superior Court,* 4 Civ. 7740.)

has been held applicable to intrastate as well as interstate communications. (*Elkins* v. *United States,* 266 F.2d 588.) However, in *People* v. *Broady* (1959) 5 N.Y.2d 500 [186 N.Y.S.2d 230, 158 N.E.2d 817], it was held that the enactment of the Federal Communications Act of 1934 did not evince a congressional plan to occupy the field of wiretapping and thus the state could legislate against unlawful wiretapping within its own boundaries. ■ Consequently, state prohibitions against wiretapping within its own borders do not conflict with the supremacy clause contained in the U.S. Constitution. (*Robert* v. *State* (1959) 220 Md. 159 [151 A.2d 737].)

### Constitutionality of Penal Code, Section 640 Relative to the Ex Post Facto Contention

■ State legislation as embodied in Penal Code, section 640, makes the offense punishable as a felony or a misdemeanor; the Federal Act defines it as a misdemeanor only. The federal law was enacted in 1934 and the state wiretapping statute was passed in 1872 and last amended in 1955 insofar as the charge herein involved is concerned. The violations alleged in the information occurred in March 1964, and the trial commenced on July 20, 1964.

■ An ex post facto law is one generally which inflicts greater punishment than the law imposed for the crime at the time it was committed or which was passed after the commission of the crime of which defendant is accused. (*People* v. *Ward,* 50 Cal.2d 702 [328 P.2d 777, 76 A.L.R.2d 911].)

■ Consequently, the ex post facto contention is without merit inasmuch as the state wiretapping act was effective many years prior to the filing of the charges herein, and the punishment prescribed was not in any way changed after the commission of the offenses involved.

### Do Defendants Have an Absolute Constitutional Right to Be Indicted by a Grand Jury?

■ Prosecution by information is a proper and valid constitutional procedure for instituting state criminal proceedings. (*Hurtado* v. *California,* 110 U.S. 516 [4 S.Ct. 111, 292, 28 L.Ed. 232].) ■ Accusation by information does not constitute a violation of the Due Process Clause of the Fourteenth Amendment. (*People* v. *Erb,* 235 Cal.App.2d 650 [45 Cal.Rptr. 503].)

Thereafter, on July 24, 1964, defendants filed a petition for writ of prohibition in the California Supreme Court which was denied without opinion.

### Legality of the Search and Seizure

■ When the parasitic radio transmitter and adhesive tape were found by the officers in the outside junction box, they did not have a search warrant and the defendants were not under arrest. The telephone junction box and the attic constituted the property of the mutual corporation where the victim resided. However, consent to conduct the search was given by Lloyd Gummere to the investigating officers and the telephone repair man. Defendants contend that the introduction of the parasitic transmitter and tape in evidence was improper because the owner's consent was not obtained and the officers did not have a search warrant when such items were found.

■ Where a search is made pursuant to consent obtained from a person believed by the officer to have authority to grant such consent, such search will be held reasonable even though the officer may be mistaken as to the authority of such person. (*People* v. *Nelson,* 218 Cal.App.2d 359 [32 Cal.Rptr. 675]; *People* v. *Shepard,* 212 Cal.App.2d 697 [28 Cal.Rptr. 297].)

■ Lloyd Gummere was a resident of the apartment building, a member of the foundation, a shareholder of the mutual corporation, and had apparent authority to give consent to the search by the officer and the telephone service man.

■ Furthermore, there was evidence that the telephone junction box was located on the outside of the building, that the door of the junction box was open at the time the adhesive tape and parasitic transmitter were found, and consequently there was no invasion of anyone's privacy. (*People* v. *Bouchard,* 161 Cal.App.2d 302 [326 P.2d 646].)

■ The search of the attic was conducted by the telephone company service man who was called to the premises by the victim. No law enforcement officer was involved in the search of the attic, and the guaranty against unreasonable searches applies only to governmental agents as distinguished from private persons. (*People* v. *Randazzo,* 220 Cal.App.2d 768 [34 Cal.Rptr. 65].)

■ The seizure of the check in the sum of $150 from Wolfe to Potter, pursuant to authority of a search warrant, was proper even though it did not represent the fruit of crime or instrument of crime. All evidence of crime, not merely contraband, instruments or fruits of crime, may customarily be seized pursuant to a search warrant. (*People* v. *Thayer,* 63

Cal.2d 635 [47 Cal.Rptr. 780, 408 P.2d 108].) The check represented some evidence of the crimes here involved inasmuch as it constituted payment for Potter's services to Wolfe in conducting the investigation of Gummere.

### Constitutional Right Against Self-Incrimination

 The comment of the court and the prosecutor to the effect that the codefendants' failure to testify raised an inference of guilt as to facts within their knowledge clearly constituted error. (*Griffin* v. *California,* 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106].) Unless such error is prejudicial and results in a miscarriage of justice, it does not require a reversal under article VI, section 4½ of the California Constitution. (*People* v. *Bostick,* 62 Cal.2d 820 [44 Cal.Rptr. 649, 402 P.2d 529].)

The evidence of guilt in this case is overwhelming. Letson testified he hired Wolfe to conduct the investigation of the victim. Defendant Wolfe accepted the assignment and indicated that "Mr. Evans" would contact Letson. Defendant Potter appeared and introduced himself as "Mr. Evans." Defendant Potter went to the attic of Gummere's residence and was seen using a ladder that led to the attic and advised neighbors that he was inspecting the roof for a bonding company. Defendant Wolfe purchased the parasitic transmitter on March 11, 1964, from another private investigator. Defendant Potter's latent fingerprint was found on the adhesive tape. Both defendants were observed in a vehicle approximately 150 yards from Gummere's residence on March 13, 1964, which car was equipped with receiving and recording equipment. Therefore, the prosecutor's comment and the court's instruction did not result in a miscarriage of justice inasmuch as it is not reasonably probable that a result more favorable to defendants would have been reached if such error had not occurred. (*People* v. *Teale,* 63 Cal.2d 178 [45 Cal. Rptr. 729, 404 P.2d 209]; *People* v. *Watson,* 46 Cal.2d 818 [299 P.2d 243]; *People* v. *Estrada,* 236 Cal.App.2d 221 [45 Cal.Rptr. 904]; *People* v. *DeLeon,* 236 Cal.App.2d 530 [46 Cal.Rptr. 241].)

A copy of the fingerprint identification card of the defendant Potter was admitted into evidence, which document contained his prints and his signature. A noncoerced specimen of handwriting given by a defendant in custody does not violate the defendant's right against self-incrimination even though defendant was not advised of his constitu-

tional rights. (*People* v. *Graves,* 64 Cal.2d 208 [49 Cal. Rptr. 386, 411 P.2d 114] ; *People* v. *Harper,* 115 Cal.App.2d 776 [252 P.2d 950] ; *People* v. *Smith,* 113 Cal.App.2d 416 [248 P.2d 444].) The voluntary nature of the act in this case can be derived from the fact that the defendant Potter willingly signed an acknowledgment of legal rights after he signed the identification card in order to enable the prosecution to be conducted in Orange County instead of Los Angeles County.

### *Admission of Defendants' Extrajudicial Statements*

█ Both defendants made extrajudicial statements after their arrest without being advised as to their right to counsel and to remain silent. Defendant Wolfe freely and voluntarily stated that he was operating a radio receiver in the 40-50 megacycle band approximately 150 yards from Gummere's apartment on March 13, 1964, and that he was endeavoring to determine if a transmission was being made from a tape transmitter in Leisure World. He further stated that he did have an oral agreement with Letson for the purpose of tapping the telephone of one of the residents.

These statements were not prejudicial to defendant Wolfe inasmuch as there was independent evidence that he was in the Ford automobile equipped with a radio receiver on March 13, 1964, and Letson testified to the fact of the employment of Wolfe to conduct the investigation of the victim.

█ Defendant Potter freely and voluntarily stated that he had been in the attic above Gummere's apartment endeavoring to determine if someone had tapped Gummere's phone and admitted he was working for Wolfe. However, he denied installing any radio transmitters in the building and denied receiving any transmissions with the radio receiver.

His statements were exculpatory and not incriminating. Letson identified Potter as "Mr. Evans," and Potter was seen entering the attic by several independent witnesses. He was also seen with Wolfe in the Ford automobile. Because the independent evidence in the case was so substantial, no miscarriage of justice resulted by the introduction of the codefendants' statements. (*People* v. *Hillery,* 62 Cal.2d 692 [44 Cal.Rptr. 30, 401 P.2d 382].)

### *Double Jeopardy*

Penal Code, section 1009, authorizes an amendment of an information at any stage of the proceedings unless the substantial rights of the defendant will be prejudiced by allowing

the amendment. The section further provides that the information cannot be amended so as to change the nature of the offense.

The court's action in allowing Count II (wiretapping) of the information to be amended to include the words "wilfully, unlawfully, feloniously and fraudulently" was entirely proper and was accomplished for the purpose of correcting a technical defect in the accusatory pleading. The prohibition against repeated attempts by the state to convict an individual of an alleged offense (*Green* v. *United States*, 355 U.S. 184 [78 S.Ct. 221, 2 L.Ed.2d 199, 61 A.L.R.2d 1119] has no application whatsoever herein inasmuch as there was only one trial, and the nature of the offense was not changed, nor were the defendants prejudiced in any respect. The trial court acted in its sound discretion in allowing the amendment. (*People* v. *Wright,* 206 Cal.App.2d 184 [23 Cal.Rptr. 734].)

### Court's Refusal to Send Information to Jury Room

It is in the sound discretion of the trial court whether to send the information to the jury room. (*People* v. *Rosoto,* 58 Cal.2d 304 at page 356 [23 Cal.Rptr. 779, 373 P.2d 867].)

In response to the jury's request to see the information, the court did direct the jury to be returned and had the clerk read the amended information in open court. Thus, the jury was fully apprised as to the nature of the charges contained in the amended information.

### Instructions to Jury

Defendants offered an instruction on specific intent but the court refused the offer. However, the subject of specific intent was thoroughly and adequately covered in another instruction and repetition is not required. (*People* v. *Caldera,* 173 Cal.App.2d 98 [342 P.2d 945].)

The court refused defendants' offered instruction defining "feloniously," "unlawfully," and "fraudulent." All are words of common usage which have no special legal meaning, and the trial court is not required to instruct on the meaning of ordinary language. (*People* v. *Chapman,* 207 Cal. App.2d 557 at page 578 [24 Cal.Rptr. 568].)

Defendants also claim as error the failure of the trial court to give instructions on additional issues, but fail to cite an authority for the proposition that such failure constituted error. The record discloses the court administered correct instructions on all material issues of law.

Judgment is affirmed.

McCabe, P. J., and Tamura, J., concurred.

A petition for a rehearing was denied March 28, 1966, and appellants' petition for a hearing by the Supreme Court was denied May 4, 1966.