[Crim. No. 5856. Second Dist., Div. One. May 6, 1958.]

THE PEOPLE, Respondent, v. MANUEL DIAZ et al., Defendants; FREDERICO MUNOZ, Appellant.

Frederico Munoz, in pro. per., and Joseph M. Rosen, under appointment of the District Court of Appeal, for Appellant.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

WHITE, P. J.—In an information filed by the district attorney of Los Angeles County, the above named defendants* were charged in three counts with the crime of robbery. The basis for the three counts involved the presence of three people at the time of the robbery and from each of whom money was taken by force and through fear upon the part of the victims. The three defendants pleaded not guilty, waived trial by jury and were, by the court, found guilty as charged in the three counts. The court found the crime to be robbery of the first degree. Defendant Munoz's motion for a new trial was denied and he was sentenced to state prison. From the judgment of conviction and the order denying his motion for a new trial, defendant Munoz prosecutes this appeal.

The following is a fair statement of the factual background surrounding this prosecution. On April 24, 1956, Carl Smith, his wife Helen Smith, and Carl's brother, Clifford Smith, were residing together in a house at Harbor City, in Los Angeles County. Mrs. Smith had retired shortly after 9 p.m., and Carl and Clifford Smith were watching television in the living room of their home. In addition to the light emanating from the television screen, the living room was illuminated by a lamp located atop the television cabinet and containing a 100-watt bulb.

At approximately 9:35 or 9:40 p.m. the front door burst open and two men came in, each with a gun in his hand. They wore dark glasses and one of them had a band-aid on his face, but they were not masked. They closed the door, approached Carl and Clifford Smith, informed them that this was a holdup, and ordered them to get on the floor. When Carl Smith did not comply immediately, one of the men drew a knife, poked it at him, and kicked him in the shins. Carl thereupon joined his brother on the floor.

One of the intruders quickly pulled down the window shades in the living room. The hall light was turned on, and the other man ran into Mrs. Smith's bedroom, ordered her to remain quiet, then returned to the living room. The brothers were ordered to produce their billfolds, but only Clifford did so, Carl stating that he did not have his with him. Clifford's billfold, containing approximately $55, was taken by one of the robbers. Carl was then bound and left lying in the bathroom; Clifford was bound and left on the hallway floor. Every light in the house was turned on at

this time. Subsequently, adhesive tape was placed over the eyes of the two brothers, and thereafter Clifford could see nothing. Carl, however, was still able to see out of one eye.

The same man who had previously entered Mrs. Smith's bedroom returned and bound her. Thereafter, she was able to see very little, but could hear "almost everything."

Later, Carl and Clifford Smith each heard the front door close again, and shortly thereafter they heard the voice of some third person in addition to the voices of the two strangers who were already in the house. The two brothers thereafter heard the sound of drawers and cabinets being opened and the contents dumped out, and they also heard the three voices conversing in Spanish. At that point Carl Smith, who was able to see despite the tape which had been placed about his eyes, noticed, for the first time that evening, Wilber Nobriga, a person who had formerly worked for Mr. Smith and who had been in the latter's home on an errand on a prior occasion. Nobriga twice passed the door to the bathroom where Carl Smith was lying, and Mr. Smith was positive, as to his identity.

The intruders remained in the Smith household until about 11:45 p.m. Shortly before they left, Mrs. Smith heard a car, which had apparently been parked up the street, approach the front of the house. She then heard the car door slam and heard the vehicle drive away.

Mrs. Smith was the first to get free of her bonds; she phoned the police. As soon as the police arrived, the Smiths related the events of the evening to them, and Carl Smith informed them that Wilber Nobriga was one of the men involved.

Defendant Munoz (appellant) testifying as a witness in his own behalf denied that he was a participant in the robbery here in question, but was unable to recall where he was on the evening of the robbery. In answer to a question, "I want to ask you what you were doing on April 4th of this year at about 9:30 that night?" he replied, "If I could only remember, I wouldn't be here." He did testify that on that date, "I must have been in San Pedro." That he was then living there with his mother, brothers and sisters, and was "going to the barber college."

Mike Diaz, a defense witness, testified that he was acquainted with defendant Munoz. That he, Diaz, and two other men, none of whom were the defendants herein, committed the robbery with which we are here concerned. When asked, "Who

were the persons that entered that home with you?'' the witness replied, ''I am not able to mention any names as far as these persons are concerned.'' When pressed for a reason why he was ''not able to mention any names,'' the witness replied, ''Well, I would say that my life wouldn't be worth a nickel.'' The witness Diaz was cross-examined by the deputy district attorney and interrogated at great length by the trial judge, the latter of whom subsequently stated, ''After all, the manner in which he (the witness) suggests the job was pulled and the reason for the late arrival for one (of the robbers) is exactly identical with the People's theory in this case.'' During the course of the interrogation of the witness Diaz by the court, it was brought out that the former and the three defendants here involved were together in the county jail, that he first mentioned his complicity in the aforesaid robbery about a month and a half prior to the trial. The witness Diaz testified in detail as to the kind and location of furniture, television set, etc., in the house of the victims which accorded with testimony given by them. At the conclusion of his examination of the witness, the trial judge stated, ''I might say as a preliminary, that I am satisfied that this man is either the world's most consummate liar or else he was present in this house at the time this crime was committed. . . . I might observe for the benefit of Mr. Major (counsel for defendant Munoz) in particular, that if we consider the motives that quite possibly activate this man in connection with his present confession coupled with his announced reasons for refusing to name the other participants in the crime, we arrive at the conclusion which reacts unfavorably to the present defendants because despite the fact that there are a lot of television programs wherein real rough and tough gangsters are out killing people who inform on them, I don't think that we can classify Mike Diaz as a gangster. I think he is just a cheap hoodlum, if you want my opinion of it, and this asserted statement that somebody is going to kill him, that comes right from television programs so far as I am concerned.''

Victor Verdugo, as a defense witness, testified that he was identified and ''picked out'' in a police ''line-up'' by a man and a woman as one of the robbers present at the Smith home. The record reveals that a comparison of the features of the witness and those of defendant Munoz indicates that the witness had a ''thin face'' as contrasted with the ''wide face'' of defendant Munoz.

In his opening brief which was filed by appellant in

propria persona, it is first contended that the testimony of Mike Diaz completely "exonerated appellant." This is quite true if the testimony of Diaz is believed, not by the appellate tribunal, but by the duly constituted arbiter of the facts. █ Under our law, the weight to be given evidence, and the credibility of a witness are questions for sole and exclusive determination by the trier of facts. █ And, the latter is not required to accept the testimony of a witness as true though it stands uncontradicted where the trier of facts determines that such testimony lacks verity (*People* v. *Woods*, 75 Cal.App.2d 246, 248 [170 P.2d 477]; *People* v. *Silva*, 119 Cal.App.2d 421, 426 [259 P.2d 74]). █ In the instant case, the judge who tried the case stated unequivocally that he disbelieved the testimony of Mike Diaz and gave his reasons therefor, when in his summation of the evidence he said, in part: ". . . as to Mike Diaz's story, the evidence is uncontradicted that prior to the time when these three defendants were arrested, he was offered a chance to get a free ride, let's call it, with reference to any other crimes of which he might be guilty if he would confess to them and so forth. He confessed to two different crimes which had nothing to do with the particular crime with which he was charged at that time. He had a chance for a free ride with the assurance that any information he gave would be held in confidence and so forth. At that time he did not see fit to unburden himself of this confession with reference to his alleged participation in the Smith robbery.

"After the arrest of his brother and his two friends, he comes forth with this tale. . . . In any event, considering the testimony with reference to the things he observed in the house, it seems clear to the Court that the story which Mike Diaz tells is fashioned out of whole cloth with this possible exception, that he may have participated in this robbery along with the three defendants in Court. That I do not know; but in any event, things which should have been plainly obvious to a person who ransacks a house for two and a half hours seems to have missed Mike entirely." We cannot say that the cogent reasons advanced by the trial judge for his disbelief of the testimony of Mike Diaz are lacking in either logic or reasonableness.

█ Appellant's next contention in his opening brief that no corpus delicti was proven as to the alleged robbery of Carl Smith is without merit. Appellant's argument that there was

no proof that anything was taken from Mr. Smith is refuted by the record wherein appears the following:

"Q. Without your going through this item by item . . . could you tell me what your immediate, that is, yours and Mrs. Smith's, *overall* loss was, if it was in dollars and cents. A. Yes. About six hundred. A little bit over six hundred.

. . . . . . . . . . .

"Q. Was any of this property *taken from you* with your permission . . . ? A. No. None of it at all." (Emphasis added.)

 Equally untenable is appellant's next claim that the deputy district attorney was guilty of prejudicial misconduct, by asking "leading and suggestive questions." In support of his claim appellant refers us to the questions above set forth, and which were asked during the examination of Carl Smith, one of the victims. No objection was made to the questions at the trial and indeed they cannot be characterized as either leading or suggestive of the desired answer. The case of *People* v. *Baker*, 147 Cal.App.2d 319 [305 P.2d 97], and *People* v. *Bentley*, 131 Cal.App.2d 687, 690 [281 P.2d 1], relied upon by appellant, do not aid him. Primarily, they have to do with inadmissible statements volunteered by a witness.

 Appellant next predicates prejudicial error on his claim that the trial judge considered the fact that the former was seen at a gasoline station in the company of his codefendants, as an "implied admission" of guilt. Nowhere in the record do we find that the trial judge used the foregoing phrase as referring to the question of appellant's identification. Testimony that appellant was seen in the company of his codefendant at a gasoline station, and that he slouched down in the automobile in which he was seated when he was under observation of two of the victims of the robbery was properly received in evidence as tending to show a consciousness of guilt on appellant's part (*People* v. *Dabb*, 32 Cal.2d 491, 500, 501 [197 P.2d 1]). Moreover, in view of the direct and positive evidence indicating appellant's complicity in the crime, it was not necessary for the trial judge to resort to a theory of "implied admissions" to warrant a reasonable conclusion of guilt.

 In his opening brief appellant next contends that the trial judge erred in taking "judicial notice" of "the type of living quarters that people of Mexican nationality have and would be familiar with." The use of the term "judicial

notice'' occurred during the trial while the judge was narrating his reasons for disbelieving the aforesaid testimony of Mike Diaz, and wherein the former stated: ''The bedroom (in the Smith residence) has three painted walls and one papered wall. That's something that's so unusual, I mean the Court would have to take *judicial notice* of the fact that few Mexican families go in for that type of decoration. That is a very unusual decoration and I am sure that he would have noticed it had he been there.'' (Emphasis added.) While courts are permitted to take judicial notice of the customs and everyday happenings of contemporary life, it is manifest that use of the criticized terms, in the instant case, in no way prejudiced appellant.

The next complaint of appellant is that the trial judge abused his discretion in refusing the former's ''seasonable and reasonable request'' that the court view the interior of the Smith home. While section 1119 of the Penal Code authorizes the trier of facts to view the premises in which the offense was allegedly committed, it makes such action contingent upon ''the opinion of the court,'' that such view is proper. The authorities are uniform in holding that such a viewing of the premises is wholly within the discretion of the trial court (*People* v. *Hood,* 140 Cal.App.2d 585, 588, 589 [295 P.2d 525] ; *People* v. *Kepford,* 10 Cal.App.2d 128, 130 [51 P.2d 429] ; *People* v. *Howard,* 28 Cal.App. 180, 181 [151 P. 754].) In the case at bar, a detailed and comprehensive word-picture of the Smith home and its furnishings was furnished by the testimony of Mrs. Smith and other witnesses. Under the facts and circumstances present in the case at bar, the trial judge did not abuse his discretion when he declined to view the premises.

The trial judge committed no prejudicial error when he refused to make inquiry into the results of a lie detector test administered to Victor Verdugo, a witness for the defense. In determining the verity of the witness Verdugo, the trial judge was not required to probe into the lie detector test because the reliability of such a test, as a method of proof, has not been established and is quite doubtful (*People* v. *Wochnick,* 98 Cal.App.2d 124, 128 [219 P.2d 70]). Although not required so to do, the trial judge gave his reasons for disbelieving the testimony of the witness Verdugo, viz., that the latter was a convicted felon, and that he was not satisfied with Verdugo's testimony concerning the lie detector test: ''It is just inconceivable to me that a man should be subjected to a

lie detector test to determine whether or not he is involved in a given crime without questions being asked covering the specific details of the crime all the way through. That is the only conceivable way that I can see that they could give a lie detector test. I suspect that that was done and Mr. Verdugo's statement that he was not asked about any of the swack and so forth is false.''

In his closing brief filed by court-appointed counsel, appellant elaborates upon the contention made in the opening brief, that the evidence is insufficient to support the judgment of conviction, and that the trial judge was guilty of prejudice and bias.

As to the insufficiency of the evidence, appellant concedes that it is a rule of law, as announced in *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778], that ''. . . where there is evidence, circumstantial or otherwise, that a crime has been committed and that the defendant was the perpetrator thereof . . . , the court on appeal 'will not attempt to determine the weight of the evidence, but will decide only whether upon the face of the evidence it can be held that sufficient facts could not have been found by the jury to warrant the inference of guilt. For it is the function of the jury in the first instance, and of the trial court after verdict, to determine what facts are established by the evidence, and before the verdict of the jury, which has been approved by the trial court, can be set aside on appeal upon the ground' of insufficiency of the evidence, 'it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below. The determination of a charge in a criminal case involves proof of two distinct propositions: First, that the offense charged was committed, and second, that it was perpetrated by the person or persons accused thereof. . . . We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict.' If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury. (Citing cases.) '' ██ However, in the case now engaging our attention, appellant asserts, that as a matter of law, the evidence is insufficient to support a reasonable conclusion that he was one of those who committed the robbery in the Smith

household. To support this claim, appellant challenges the substantiality of the testimony identifying him as one of the participants in the robbery. Conceding that he was positively identified appellant insists that the victims had little opportunity to make an identification. That certain inconsistencies appear in the testimony of Clifford Smith as given at the trial and what he stated at the preliminary examination. That Carl L. Smith, another of the victims, identified, in a police line-up, one Victor Verdugo as being one of the robbers. We are directed to the testimony at the trial describing the difference in facial features of Victor Verdugo and appellant. The latter further argues that it is a fair inference from the evidence that Mrs. Helen Smith was with her husband when the erroneous identification of Verdugo was made at the police line-up.

While the alleged variances or inconsistencies in the testimony of Clifford Smith and the claimed weakness of the testimony identifying appellant undoubtedly afforded opportunity for a persuasive argument to the duly constituted arbiter of the facts against the reliability of such testimony, we are unable to say, as a matter of law, that the evidence in its entirety was not sufficient to support the conviction of appellant. The question of whether his identification was sufficient was one of fact for the trial judge and where, as here, his finding was supported by substantial, though contradicted evidence, it will not be disturbed (*People* v. *Newman*, 102 Cal.App.2d 302, 305 [227 P.2d 470]). As to the sufficiency of the identification of an accused in a criminal case, the rule is thus stated in *People* v. *Farrington*, 213 Cal. 459, 463, 464 [2 P.2d 814] : "The strength or weakness of the identification, the incompatibility of and discrepancies in the testimony, if there were any, and the uncertainties of witnesses in giving their testimony were matters solely for the observation and consideration of the jurors in the first instance, and for the consideration of the trial court on motion for a new trial. It has approved the finding of the jury, and on appeal this court may not disturb such finding and the action of the trial court unless we can say, as a matter of law, that there was no evidence to support the conviction. (*People* v. *Erno*, 195 Cal. 272, 283 [232 P. 710].)" On the record presented to us, we cannot say that this is such a case.

Finally, appellant contends that the trial judge was prejudiced and biased against the defendants at the trial, by reason of which they were denied that fair and impartial

trial guaranteed them by law. In this regard, appellant directs our attention to the remarks of the court when the motion for a new trial was being heard, and the court, referring to the testimony of the witness Mike Diaz, said: "I might say that there is one real good way that you gentlemen could certainly get a new trial and this is all you have to do is get Mike to name the accomplices; that's all. It's a real simple thing and I am sure that these gangbuster TV shows and so forth are real nice and these big tough Chicago and New York gangsters are rough boys, but Mike convinced me of nothing, that he is involved in any gangs of that type. So if I were you, I would just get brother Mike to just say it was Joe Blow and somebody else and we will stop everything and do a little investigating." And again, in the same proceeding on motion for a new trial, when, with reference to the testimony of the witness Victor Verdugo, the trial judge remarked: "Is the lad about whom you are speaking the lily white boy who was cleared on a lie detector test and he knew nothing about anything, is that the man you are talking about?" We perceive no prejudicial misconduct in the foregoing. The trial judge, on hearing of the motion for a new trial, in answer to argument by counsel for the defendants, was merely stating his reasons for rejecting the testimony of two witnesses who testified for the defendants.

For the foregoing reasons, the judgment and the order denying defendant's Munoz's motion for a new trial are, and each is affirmed.

Fourt, J., and Lillie, J., concurred.

A petition for a rehearing was denied May 26, 1958, and appellant's petition for a hearing by the Supreme Court was denied July 2, 1958.