[Crim. No. 17304. Second Dist., Div. Five. Aug. 25, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANK CARDILLI VENEGAS, Defendant and Appellant.

## Counsel

Frank Cardilli Venegas, in pro. per., and Richard H. Levin, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Alexander B. McDonald, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**AISO, J.**—The information charged defendant in count I with an assault with a deadly weapon with intent to commit murder (Pen. Code, § 217) and count II with a convicted felon's possession of a firearm (Pen. Code, § 12021). He waived jury trial and the court found him guilty on both counts. Motion for new trial and probation were denied. Defendant was sentenced to state prison on both counts, the sentences thereon to run concurrent with each other and concurrent with any other sentence, service of which defendant had not completed. He appeals from the judgment.

Defendant contends upon appeal: (1) imposition of sentence upon both counts I and II constituted a violation of section 654 of the Penal Code enjoining the imposition of multiple punishments for a single criminal act; (2) sentence on the violation of section 12021 of the Penal Code[1] also violated the federal and state constitutional prohibitions against ex post facto laws; and (3) the trial judge's admonition to the witness Rodriguez, the victim of the assault charged, concerning the laws of perjury during his examination as a witness constituted prejudicial misconduct.

Review of the record and applicable law leads us to conclude that defendant's contention (1) *supra* has merit and that the judgment accordingly should be reversed insofar as it imposes sentence on count I, but in all other respects the judgment should be affirmed.

### I.

On the evening of March 11-12, 1969, defendant Venegas, his friend Jose Richard Rodriguez, and their respective female acquaintances Mrs. Sherry Ann Light and Mrs. Juanita Bueno, were at the Plush Bunny Club in Pico-Rivera from around 9 p.m. to around 1 a.m. The four were seated around a table, 18 to 20 inches in diameter. Diane Fike was a waitress on duty in the area. She had served them during the evening, dispensing alcoholic beverages to some and nonalcoholic drinks to others. When defendant and Rodriguez ordered drinks around 1 a.m., she refused to serve them, requesting defendant to tell Rodriguez that he could not have any more drinks as he was "nodding on the table."[2] Defendant then leaned across the table as if he were going to speak to Rodriguez, so Mrs. Fike returned to her station near the bar. There she conversed with Frank

---

[1] All subsequent references to code sections are to the Penal Code.

[2] At the trial, Rodriguez conceded that he had been drinking that evening and was slightly drunk. His friend Mrs. Bueno testified, however, that Rodriguez was "pretty well drunk."

Ettinger, the owner of the bar, informing him that she had refused to serve defendant and Rodriguez.

Ettinger left her and walked towards the poolroom area of the club. At that juncture, Mrs. Fike heard a shot or a loud noise, like that of a firecracker, coming from the section of the club assigned to her. She saw defendant with a gun in his hand pointing it across the table at Rodriguez. Another two shots followed. She saw Rodriguez in a "half standing" position begin to fall towards the dance floor. At the time of the shooting, defendant was only 2 or 3 feet from Rodriguez. Mrs. Fike was only 8 or 9 feet away when she observed the incident.

Ettinger was on his way to alert his floor man concerning the conduct of defendant and Rodriguez reported to him by Mrs. Fike when he heard a muffled shot. He immediately turned towards the area from which the sound had come. As he took a couple of steps forward, he heard two more shots. He proceeded to where Rodriguez was on the floor. As he did so, he saw defendant running alone towards the main entrance of the club. Ettinger's son caught defendant, grabbed him, and knocked him down onto the floor, where he was held until the police arrived.

Carmen Cadillo, who was present in the club, saw a gun on the floor about 15 feet away from defendant, picked it up, and gave it to Ettinger, who in turn gave it to Deputy Sheriff Hellesen who arrived at the club. The gun contained three live and three expended .38 caliber rounds of ammunition. One of the live rounds bore a mark as if it had been struck by the firing pin.

During the time Ettinger's son was holding defendant on the floor, Mrs. Light clung to defendant, interfering with Ettinger and his controlling defendant. While clinging to defendant, she said, "He didn't mean it." When Ettinger tried to separate her from defendant, she kept responding, "No, no."

Upon his arrival at the scene, Deputy Hellesen placed handcuffs on defendant in response to Ettinger's yelling, "Put the cuffs on this man [defendant]." However, when he learned that Ettinger did not actually see defendant shoot Rodriguez, he removed the handcuffs and he did not place defendant under arrest. Later, when he was speaking to defendant outside of the club concerning the shooting,[3] Mrs. Light was standing next to defendant and facing the officer. Mrs. Fike heard her say at that time, "He didn't mean to do it. He didn't mean to do it." Defendant identified

[3]Upon defendant's raising a *Miranda* objection, this conversation between defendant and Deputy Hellesen was excluded.

himself to the officer as Frank De La Cruz, instead of Frank Cardilli Venegas.

Based upon his questioning of defendant, Deputy Hellesen was of the opinion that defendant was not drunk although he had been drinking. Defendant, he opined, was rational and coherent; defendant's responses to questions put to him were "logical."

Deputy Hellesen informed defendant and Mrs. Light that he intended to continue his investigation at the hospital and requested that they follow him there. Both agreed to do so, but in fact did not go there. Instead, according to Mrs. Light, she drove defendant to his father's home because he passed out. Defendant was ambulatory, but not fully conscious and was rambling in his speech. It was at the father's home that Mrs. Light first noticed that defendant had a gunshot wound in his left leg. It "didn't look very bad. There was very little bleeding." She informed defendant that she had been instructed to take him to the hospital, but defendant replied that "he didn't want to go to the hospital or to a doctor."

Later when the police came to her home, she led them to the house to which she had taken defendant. Defendant, however, was no longer there. No one at the house knew of his then whereabouts.

Rodriguez required surgery. One bullet had entered his left stomach area; another, his right shoulder. He was hospitalized for a total of a month.

A couple of days after the shooting, defendant came to Mrs. Light's house and inquired as to what had transpired at the Plush Bunny Club on the evening in question. She replied that she did not know except that Rodriguez had been shot. When she inquired about defendant's wound, he answered, "somebody pulled a gun and [defendant] was wrestling with it."

Sometime later but before trial, Rodriguez visited the Plush Bunny Club, accompanied by defendant's lawyer and a third person. In response to Ettinger's questions, Rodriguez when he was alone told Ettinger that he and defendant were good friends and that he did not know why defendant did it—"You know, I don't know why he'd want to shoot me."

Defendant's convicted felon status was proved by documentary evidence, fingerprint exemplars, and the testimony of a fingerprint specialist.

The defense theory was that the person who shot Rodriguez was an unidentified third person, and not defendant. In this regard, Rodriguez

had testified when called by the People as a witness that he saw the person who shot him, but that it was not defendant, who was "trying to take the gun from some other people."

Ramon Sandoval was called as a defense witness and testified: He was not acquainted with defendant, Rodriguez, Sherry Ann Light, or Juanita Bueno. He had not spoken to any of them or any other persons in court, but managed to ascertain the proper court at the time of trial. He had visited the club subsequent to the shooting and had heard talk that defendant had been accused of shooting Rodriguez. He was offering himself as a witness, interested only in seeing that an innocent man would not be found guilty. He was present at the time of the shooting. He saw the person who shot Rodriguez. It was not defendant. A man just walked up to the table and pulled out a gun. Since he (Sandoval) left the club right after the shots were fired, he was unable to give specific details as to that person.

Jay Contrelli, called as a defense witness, testified: He was a member of the seven-piece band employed at the club. He heard a noise like that of a firecracker. He saw *two* people struggling. He saw a hand with a gun in it, then two flashes. One of the two who had been struggling fell to the floor; the other person ran out the back door. Because the person running out the door was seen from his back, Contrelli was unable to describe the runaway. Although he did notice the "bouncer of the club fighting with somebody," he saw one body on the floor, which he covered with someone's coat as a blanket was not available.

Defendant did not testify.

Additional facts or evidence will be set forth where germane to a particular issue under discussion.

## II.

■ It is established law that section 654 does not interdict multiple prosecutions where a single act may constitute more than one crime; however, it does forbid the imposition of multiple punishment on convictions growing out of a single criminal act. (See, e.g., *In re Ward* (1966) 64 Cal.2d 672, 676 [51 Cal.Rptr. 272, 414 P.2d 400], cert. denied 385 U.S. 923 [17 L.Ed.2d 147, 87 S.Ct. 238]; *People* v. *Hicks* (1965) 63 Cal.2d 764, 765-766 [48 Cal.Rptr. 139, 408 P.2d 747].) " 'Section 654 has been applied not only where there was but one "act" in the ordinary sense . . . but also where a course of conduct violated more than one statute and the problem was whether it comprised a divisible transaction which could be punished under more than one statute within the meaning of section 654.' (*People* v. *Brown, supra* [(1958) 49 Cal.2d 577, 591 (320 P.2d 5)].) [¶] Whether a course of criminal conduct is divisible and there-

fore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal* v. *State of California* (1960) 55 Cal.2d 11, 19 [9 Cal.Rptr. 607, 357 P.2d 839], cert. denied 365 U.S. 823 [5 L.Ed.2d 700, 81 S.Ct. 708]; accord *People* v. *Bauer* (1969) 1 Cal.3d 368, 376 [82 Cal.Rptr. 357, 461 P.2d 637], and cases cited.) The fact that the sentences on separate counts are ordered to run concurrently does not render the foregoing rule inapplicable. (*People* v. *Diaz* (1967) 66 Cal.2d 801, 807 [58 Cal.Rptr. 729, 427 P.2d 505]; *In re Wright* (1967) 65 Cal.2d 650, 652-653 [56 Cal.Rptr. 110, 422 P.2d 998]; *People* v. *Quinn* (1964) 61 Cal.2d 551, 555-556 [39 Cal.Rptr. 393, 393 P.2d 705].)

█ Whether a violation of section 12021, forbidding persons convicted of felonies from possessing firearms concealable upon the person, constitutes a divisible transaction from the offense in which he employs the weapon depends upon the facts and evidence of each individual case. (*People* v. *Brown* (1958) *supra,* 49 Cal.2d 577, 591.) Thus where the evidence shows a possession distinctly antecedent and separate from the primary offense, punishment on both crimes has been approved. (*People* v. *Hudgins* (1967) 252 Cal.App.2d 174, 184-185 [60 Cal.Rptr. 176], cert. denied 390 U.S. 965 [19 L.Ed.2d 1167, 88 S.Ct. 1073]; *People* v. *Moore* (1956) 143 Cal.App.2d 333, 342 [299 P.2d 691], questioned on other grounds in *People* v. *Keller* (1963) 212 Cal.App.2d 210, 221, fn. 3 [27 Cal.Rptr. 805].) On the other hand, where the evidence shows a possession only in conjunction with the primary offense, then punishment for the illegal possession of the firearm has been held to be improper where it is the lesser offense. (*People* v. *Burnett* (1967) 251 Cal.App.2d 651, 658 [59 Cal.Rptr. 652]; cf. *In re Grossi* (1967) 248 Cal.App.2d 315, 321-322 [56 Cal.Rptr. 375]; *In re McWhinney* (1968) 267 Cal.App.2d 691, 695 [73 Cal.Rptr. 291].)

█ Here the evidence shows a possession only at the time defendant shot Rodriguez. Not only was the possession physically simultaneous, but the possession was incidental to only one objective, namely to shoot Rodriguez. Imposition of sentence upon both counts I and II, therefore, constituted multiple punishment proscribed by section 654.

█ "If multiple punishment has been erroneously imposed, the *appropriate procedure on appeal* is to eliminate the effect of the judgment as to the lesser offense or offenses insofar as the penalty alone is concerned. (*In re Wright, supra,* 65 Cal.2d 650, 656 [5]; *In re Ward, supra,* 64 Cal.2d

672, 676 [6].)" (*People* v. *Diaz* (1967) 66 Cal.2d 801, 807 [58 Cal.Rptr. 729, 427 P.2d 505], italics added; accord: *In re McGrew* (1967) 66 Cal.2d 685, 688-689 [58 Cal.Rptr. 561, 427 P.2d 161]; *People* v. *McFarland* (1962) 58 Cal.2d 748, 763 [26 Cal.Rptr. 473, 376 P.2d 449].)

■ Determination of the lesser offense in this case is not without some difficulty. One's off hand reaction is that a violation of section 12021 would be the lesser. However, the Legislature has prescribed the punishment for a violation of section 217 to be "imprisonment in the state prison not less than one nor more than *fourteen years,*" while it has made a violation of section 12021 "punishable by imprisonment in the state prison *not exceeding 15 years,* or in a county jail not exceeding one year or by a fine not exceeding five hundred dollars ($500), or by both." (Italics added.) At the trial level, it would have been possible to make the section 217 violation the greater offense for purposes of punishment by the court imposing a misdemeanor sentence on the section 12021 violation and staying its execution in accordance with the so-called "*Niles* formula" (*In re Wright* (1967) *supra,* 65 Cal.2d 650, 655-656, fn. 4), since the appellate determination of the applicability of section 654 is premised upon the sentence imposed by the trial court (cf. *People* v. *Hicks* (1965) *supra,* 63 Cal.2d 764, 766). The court in *Hicks* postulated its ascertainment of the lesser offense within the meaning of section 654 upon the fact that the trial court had ordered the sentences it had imposed upon three separate sex offenses which occurred following one burglarious entry to run consecutive to each other.

Since the trial court pronounced state imprisonment on both counts of which defendant was convicted, only the state imprisonment portion of section 12021 prescribing 15 years as the maximum possible period of confinement is cognizable here. The sentence on count I (violation of § 217) carrying a maximum of only 14 years then becomes the lesser offense and must be set aside. The sentence on count II (violation of § 12021) should be affirmed.

### III.

■ We find no merit to defendant's argument that application of section 12021, as amended in 1965 to increase the maximum possible state prison sentence from 5 to 15 years, to him violates the constitutional prohibitions against ex post facto laws (U.S. Const., art. I, §§ 9, 10; Cal. Const., art. I, § 16), because the violation of section 12021 of which he stands convicted rests in part upon a felony conviction which occurred in 1964 before the 1965 amendment.

"An ex post facto law is one generally which inflicts greater punishment than the law imposed for the crime *at the time it was committed* or which

was *passed after the commission of the crime of which defendant is accused.*" (*People* v. *Potter* (1966) 240 Cal.App.2d 621, 629 [49 Cal.Rptr. 892], italics added; cert. denied 388 U.S. 924 [18 L.Ed.2d 1374, 87 S.Ct. 2118].) Section 12021, as amended in 1965, was on the books for years prior to defendant's violation of section 12021 on March 12, 1969, and for which he was convicted. A statute is not retroactive in operation merely because it draws upon facts antecedent to its enactment for its operation. (Cf. *Abrams* v. *Stone* (1957) 154 Cal.App.2d 33, 40-41 [315 P.2d 453].) It has been held that drawing upon a felony conviction even prior to the time there was any legislation prohibiting possession of a firearm concealable upon the person by one previously convicted of a felony (*People* v. *Camperlingo* (1924) 69 Cal.App. 466, 470-471 [231 P. 601]) or a felony conviction prior to its effective date (*People* v. *James* (1925) 71 Cal.App. 374, 378-379 [235 P. 81]) does not render the new law a bill of attainder or an ex post facto law. The crime for which the defendant is punished in an instance such as we have here is not the earlier felony, but the new and separate crime of which the prior felony conviction is only a constituent element. Without the defendant's commission of new and additional acts after he has notice of the new legislation, the statute passed or amended after the constituent felony conviction would not come into play.

Here defendant had notice of the 15 years' possible maximum penalty prior to the criminal acts he committed on March 12, 1969. The penalty provisions applied to him were not changed subsequent to that date. There was no retroactive application of section 12021 in this case and that section, including its penalty provisions in effect on the date of the crime, did not constitute ex post facto legislation when applied to him. (Cf. *People* v. *Calderon* (1962) 205 Cal.App.2d 566, 572-573 [23 Cal.Rptr. 62].)

## IV.

Defendant finally urges that the trial judge's admonishing the witness Rodriguez of the possible punishment for perjury constituted prejudicial misconduct because (1) he was singling out Rodriguez and "not treating all witnesses equally," and (2) it indicates a failure to withhold judgment as to guilt or innocence of the defendant until all of the evidence has been presented.

Mrs. Fike, the first witness called at the trial, testified that she saw defendant shoot Rodriguez (the victim of the assault with intent to commit murder charged by the People in count I). Rodriguez was then called by the People as a witness. He testified: That although he and defendant were good friends, he would testify. He did not know who had shot him, otherwise he would have the person in court. He was "[s]ome man that came up and went like that." He saw Frank Venegas as he (Rodriguez) was going

down; Venegas was up and "trying to take the gun from some other people." His assailant held the gun within one foot of him, facing him, and he saw the man, but it was not the defendant.

Because Rodriguez was failing to heed the court's admonition to wait until the prosecutor had completed his question and to then answer directly, the court had taken over the questioning covering approximately three pages of the reporter's transcript preceding the colloquy in question. When Rodriguez stated that his assailant was not the defendant, the following colloquy which defendant assigns as error took place:

"THE COURT: Do you understand the laws of perjury in the State of California?

"THE WITNESS: Yes, I do.

"THE COURT: What are they? If you lie under oath, it is a separate criminal offense, a felony, in the State of California, for which you can be convicted if the charges are proved and sent to State Prison. Now, this is not a game the Court is playing here, and you are not just a participant in a football game or a baseball game. You are here on a very serious matter.

"THE WITNESS: Your Honor, I know what I face.

"THE COURT: I suggest to you that you tell the truth, because there are a series of witnesses who are going to testify and if this Court reaches a conclusion that you have committed perjury, I will insist that the District Attorney file criminal charges of perjury against you. I want that absolutely clear. [¶] Proceed, Counsel.

". . . . . . . . . . . . . . . . . .

"THE COURT: Counsel, the Court would like to read for the witness the punishment for perjury. [¶] Perjury is punishable by imprisonment in the State Prison for not less than one or more than 14 years. [¶] You already know the punishment is for false testimony under oath. You are under oath. The Court wishes you to be fully aware of this, because the statement which the Court made is not an idle statement."

The defendant thereupon moved for a mistrial on the ground of prejudicial misconduct. This motion was denied. After hearing the remainder of Rodriguez' testimony and that of witnesses Juanita Bueno, Sherry Ann Light, Carmen Cadillo, Frank Ettinger, Deputy Hellesen, and fingerprint expert Lloyd Wyant for the prosecution, and witnesses Ramon Sandoval and Jay Contrelli for the defense, the court found defendant "guilty on each count."

It has been held that even in a trial to a jury instead of to the court as in the instant case a court's comment inferring that a witness had possibly committed perjury was not prejudicial error where the witness' testimony contained many conflicts, inconsistencies and improbabilities. (*People* v. *Herrera* (1965) 232 Cal.App.2d 561, 563 [43 Cal.Rptr. 14], overruled on other grounds in *People* v. *Perez* (1965) 62 Cal.2d 769, 776 [44 Cal.Rptr. 326, 401 P.2d 934].) The court's colloquy with Rodriguez at the time it admonished Rodriguez concluded as follows:

"THE COURT: Counsel, the Court has a duty to instruct the witness on the law of perjury when it believes that he may—he is obviously a hostile witness, and he's been extremely argumentative and evasive, and I think that it is the duty of the Court to instruct him on the law of perjury because, if he does lie under oath, it would be the duty of the Court to request perjury charges be filed. I want the witness to know clearly.

"THE WITNESS: I know the law.

"THE COURT: Just a moment. All the Court wishes the witness to do is to testify truthfully and nothing else.

"THE WITNESS: I am doing—

"THE COURT: All right, then, you have no problem with perjury. If you are telling the truth, there is no problem."

The court's appraisal of witness Rodriguez as hostile, argumentative, and evasive is borne out by the record. The court did not at any time directly accuse Rodriguez of lying, conduct which the appellate court condemned in *People* v. *Steinfeld* (1940) 38 Cal.App.2d 280, 282-283 [101 P.2d 89], but held to be nonreversible error absent a showing of a miscarriage of justice. (Accord: *People* v. *Johnson* (1935) 11 Cal.App.2d 22, 24 [52 P.2d 964].) The mere comment by the court in a court trial of its disbelief of a witness' testimony in a temperate manner is not error. (*People* v. *Diaz* (1958) 160 Cal.App.2d 123 [324 P.2d 887].) "Legitimate comments which are necessary to bring out the truth are in order" as long as the judge as the trier of fact withholds his final conclusion as to defendant's guilt or innocence until the conclusion of the trial. (*People* v. *Steinfeld, supra,* at p. 283.) "It is the duty of a judge when acting as the trier of the facts to pass upon the credibility of witnesses, and if he believes that a party has testified falsely, and chooses to say so rather than remain silent, he is not disqualified from proceeding to render judgment." (*Keating* v. *Superior Court* (1955) 45 Cal.2d 440, 444 [289 P.2d 209].) An expression by a

trier of fact that a particular witness is not to be believed does not necessarily mean that he has made up his mind on the ultimate issue of guilt or innocence until the trial has been concluded. (See *Gary* v. *Avery* (1960) 178 Cal.App.2d 574, 578-579 [3 Cal.Rptr. 20].)

After defense counsel had argued his motion for a new trial based upon the alleged misconduct of the trial judge in his perjury admonition to the witness Rodriguez, the court explained: "The second incident which occurred was the witness who testified, the Court thought his testimony was perjurous. [*Sic.*] I read the perjury statute to him. It is difficult to see how that can be prejudicial to the defendant, because someone must advise the witness. Certainly, it couldn't be the District Attorney. The defense counsel certainly wouldn't do it if the testimony is advantageous and favorable to his client. There is only one entity in the courtroom that could do it, and that is the Court. [¶] I believe at the time I indicated it wasn't only my right as judge of the court, but the duty to do so. [¶] However, neither event influenced the Court in any way in reaching a decision with respect to the defendant's guilt or innocence. Guilt or innocence was based upon the testimony of the several witnesses who were present and who did, indeed, testify at the trial. That applies with respect to each witness. [¶] The Court weighed carefully the testimony and credibility of each witness and concluded that the evidence was overwhelming in favor of the guilt of the defendant on each count, and the Court then rendered its decision that the defendant was guilty on each count."

In this case, no intimidation of the witness Rodriguez resulted from the court's admonition concerning perjury; he did not change the tenor of his testimony nor the manner of his testifying despite the admonition. The record substantiates the comment of the court made upon ruling on the motion for new trial that it had "weighed carefully the testimony and credibility of each witness and concluded that the evidence was overwhelming in favor of the guilt of the defendant on each count." We find no error in the judge's admonition concerning perjury in the circumstances presented by the record in this case. If perchance we be in error in our opinion as to no error, no miscarriage of justice has been shown.

## V.

The judgment is reversed insofar as it imposes sentence for the assault with intent to commit murder (count I, violation of section 217 of the Penal Code), and in all other respects it is affirmed.

KAUS, P. J.—I concur in Justice Aiso's opinion in all respects. This comment addresses itself only to a problem raised by Justice Reppy's partial dissent which would decide the divisibility of defendant's conduct by look-

ing only to his intent and objective when he acquired possession of the gun at some point before the shooting.

The problem arises from the fact that the applicability of the double punishment provisions of section 654 of the Penal Code often depends on which of several conflicting inferences, arising from the evidence introduced on the issue of guilt, is accepted by the trial court. Ironically, however, that evidence was never offered for the purpose of proving or disproving whether the defendant is subject to double punishment. Moreover, evidence which is relevant to that issue, may be inadmissible during the guilt phase of the proceeding, or may be intentionally withheld. Obviously a person who is fighting a robbery-rape charge with an alibi is not going to take the stand and testify to the full extent of his criminal objective. The trial record is therefore the wrong tool for intelligent factfinding with respect to the applicability of the relevant test under section 654.[1]

While that is a situation which we shall have to put up with until the law provides for a hearing directed toward the resolution of the issues relevant to the question of double punishment,[2] the Supreme Court—perhaps in order to alleviate the problem—is moving in a direction more in accordance with Justice Aiso's views, than those of the dissent.

I believe that in *People* v. *Bauer,* 1 Cal.3d 368, 377 [82 Cal.Rptr. 357, 461 P.2d 637], the court, in effect, disapproves of cases such as *People* v. *Roth,* 228 Cal.App.2d 522, 534-535 [39 Cal.Rptr. 582]; *People* v. *Mistretta,* 221 Cal.App.2d 42, 45-46 [34 Cal.Rptr. 365]; and *People* v. *Fields,* 190 Cal.App.2d 515, 517-519 [12 Cal.Rptr. 249], which permit double punishment on the theory that one crime was an "afterthought" and that therefore the two crimes were not "incident to one objective." (*Neal* v. *State of California,* 55 Cal.2d 11, 19 [9 Cal.Rptr. 607, 357 P.2d 839].) In *Bauer* the Supreme Court stresses a far more objective test: does the evidence show multiple crimes which are part of "a course of conduct comprising an indivisible transaction." (*People* v. *Bauer, supra,* 1 Cal.3d at p. 377.) Granted that, even so, a record made for the purpose of proving the defendant guilty is still a poor vehicle for determining an entirely different issue, the "indivisible transaction" test at least gets away from speculative inquiries into the defendant's overall objectives. Furthermore, the "intent and objective" test appears to place a premium on "thinking big" when

[1]There is nothing original in these observations. They were made by Justice Schauer in his dissent in *People* v. *McFarland,* 58 Cal.2d 748, 775 [26 Cal.Rptr. 473, 376 P.2d 505].

[2]See, however, the suggestion in the dissent in *Neal* v. *State of California,* 55 Cal.2d 11, 22 [9 Cal.Rptr. 607, 357 P.2d 839] that, at least on habeas corpus, additional evidence with respect to any section 654 question might be considered.

planning a crime wave, a perverse notion which we should not attribute to the Legislature.[3]

The reason why the transaction test is better designed to resolve any factual issue with respect to the application of section 654 is perfectly obvious: the evidence introduced on the issue of guilt is likely to be more helpful in determining objectively whether there was an indivisible transaction than, subjectively, whether the two crimes were incident to one objective. The case at bar is a perfect example. No one really cared who had possession of the gun until the moment when it was seen in defendant's hand. He may have brought it to the Plush Bunny or he may somehow have obtained it just before he used it. That question was never tried, although an answer to it might be very relevant if we are interested in defendant's overall plans for the evening. On the other hand what the evidence did reveal was a "transaction" involving defendant possessing the gun in the process of committing another crime. No distinct antecedent possession was shown. Thus, once the question of guilt had been disposed of, the trial court knew pretty well all that it would ever know if it applied the transaction test.

**REPPY, J.**—I concur in the affirmance of the convictions but I respectfully dissent from the reversal of the imposition of sentence for the assault with intent to commit murder. I do not feel that we can say as a matter of law (in opposition to the implied finding of the trial court to the contrary) that "the evidence shows a possession only at the time defendant shot Rodriguez"; that "the possession was incidental to only one objective, namely, to shoot Rodriguez."

The record clearly is supportive of the inference that defendant took possession of the weapon when he dressed at his own home and that he had possession of it for general purposes when Rodriguez picked him up so that the two could enjoy an evening of sociability with their girl friends. Certainly defendant had possession of the gun for a number of hours with absolutely no intent to use it against his friend Rodriguez. Defendant would have had possession of the weapon for some time before Rodriguez picked him up. Then, two hours went by before the couples went to the "Plush Bunny" where the incident occurred, and, inferably, there was some table sitting and drinking there before the shooting.

Defendant and Rodriguez were coworkers. No quarrel had developed be-

---

[3]Applied to the case at bar the "intent and objective" test leads to the absurd result that defendant can suffer double punishment if he armed himself for self-protection, but not if he did so for the purpose of shooting the victim during the course of the evening! All of this was foreseen by Justice Schauer in his concurring opinion in *Seiterle* v. *Superior Court,* 57 Cal.2d 397, 403 [20 Cal.Rptr. 1, 369 P.2d 697].

tween them prior to the time Rodriguez dropped defendant off at his home. In fact, no arguments between the two men occurred during the course of the evening. Defendant's shooting of Rodriguez must have been upon a sudden impulse in a flash of anger over the circumstance that the waitress would not serve any more drinks to the party because Rodriguez was "nodding at the table" (i.e., was too intoxicated).

The evidence was most positive that defendant did the shooting. Defendant's defensive effort to show that a third party had the gun seems more of a device to demonstrate that he did not have long continued possession of the weapon for general purposes than to establish that he did not do the shooting. Sherry Light testified that defendant told her later that someone had pulled a gun and that he was wrestling with it. This indicates a consciousness of guilt. Sandoval testified that he saw a third party pull out a pistol; but the judge, incidentally, said that he thought Sandoval lied. So the trial court had no belief that a third person had the gun.

Finally, it is noteworthy that the judge stated, at the close of the case, that he had carefully weighed the testimony and credibility and had "concluded that the evidence was *overwhelmingly* in favor of guilt of the defendant on *each count* . . . ." (Italics supplied.)

I feel that the circumstances of our case meet the criteria of *People* v. *Hudgins,* 252 Cal.App.2d 174, 184-185 [60 Cal.Rptr. 176], and *People* v. *Moore,* 143 Cal.App.2d 333, 342 [299 P.2d 691]. As succinctly set out by the majority in citing these cases, "[W]here the evidence shows a possession distinctly antecedent and separate from the primary offense, punishment on both crimes has been approved." When the antecedent possession has been for so long a time as that indicated in our case, two to three hours, with such control being completely unrelated to the spontaneously occurring incident, I see no reason why there should be any requirement of a break in the chain of holding in order to say that the felon-in-possession situation could be attributed to the first segment of proprietorship. Nor do I feel that it is essential that there should be a preceding and differing specific objective for the use of the gun, such as to shoot someone else. Possession for general purposes, for use in any circumstance that might develop or be developed is sufficient. The mere fact that the weapon was used when the particular inciting incident occurred at the "Plush Bunny" (and it was one most unworthy of such a reaction) does not mean that defendant had possession of the weapon to deal with no other precipitating event if one had occurred. The charge of felon-in-possession was not limited to the "transaction" of possession during the shooting of Rodriguez. I do not think we can say at this level that the trial court did not care who had possession of the gun until it was used. Circumstances showing antecedent possession

were present, whether such possession be characterized as distinct or otherwise. This evidence is in the category which "reasonably inspires confidence." *(People* v. *Redmond,* 71 Cal.2d 745, 756 [79 Cal.Rptr. 529, 457 P.2d 321], quoting *People* v. *Bassett,* 69 Cal.2d 122, 139 [70 Cal.Rptr. 193, 443 P.2d 777].) I do not feel that we can say that the trial court was not convinced by it beyond a reasonable doubt, particularly considering its observation above quoted.

Petitions for a rehearing were denied September 22, and 24, 1970. Reppy, J., was of the opinion that the respondent's petition should be granted. The petitions of the appellant and the respondent for a hearing by the Supreme Court were denied October 22, 1970. McComb, J., and Sullivan, J., were of the opinion that the respondent's petition should be granted.