Filed 8/14/14  P. v. Ward CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MARCUS WARD,<br><br>        Defendant and Appellant. | A138750<br><br>(Alameda County<br>Super. Ct. No. 1770099B) |

A jury convicted Marcus Ward of first degree murder with special circumstances (Pen. Code, §§ 187, subd. (a), 190.2, subd.(a)(17)(A)) and possession of a firearm by a felon (Pen. Code, former § 12021, subd. (a)(1)).[1]  Ward challenges the sentence imposed, contending that the trial court violated section 654's prohibition against multiple punishment by imposing a six-year prison term for the firearm possession consecutive to his life sentence without possibility of parole for the murder.  We affirm.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Ward was charged, by information, with murder (§ 187, subd. (a); count one) and possession of a firearm by a felon (former § 12021, subd. (a)(1); count two).  Count one alleged that Ward personally and intentionally discharged a firearm, causing great bodily injury and death (former §§ 12022.5, subd. (a), 12022.53, subds. (b)–(d), (g); 12022.7,

_____

[1] Undesignated statutory references are to the Penal Code.  Former section 12021, subdivision (a) was continued in section 29800, subdivision (a) (added by Stats. 2010, ch. 711, § 6) without substantive change.  (Cal. Law Revision Com., com., 51D, Pt. 4 West's Ann. Pen. Code (2012) foll. § 29800, p. 194.)

subd. (a)).  The information further alleged a special circumstance that Ward committed the murder while engaged in the commission of a robbery (§ 190.2, subd.(a)(17)(A)) and while on felony probation (§ 1203, subd. (k)).  Finally, it was alleged that Ward had suffered two prior convictions and that he had served a prior prison term (§ 667.5, subd. (b)).  One conviction was a serious felony (§ 667, subd. (a)(1)) and a prior strike (§§ 1170.12, subd. (c)(1), 667, subd. (e)(1)).

*Prosecution's Evidence*

Lashay Goulding's Testimony

Lashay Goulding testified that, in October 2011, she worked as a prostitute and had recently begun working for a new pimp, Michael Schenk.  On the morning of October 5, 2011, Goulding met another prostitute, Radajsha Briggs, at a Burger King in Oakland.  Later that morning, Goulding and Briggs picked up Gequesha Nolan at a BART station.[2]  Goulding had met Nolan, who also was a prostitute, three or four weeks earlier.  Goulding introduced Nolan to Schenk.  The three women and Schenk went to a room at a nearby Motel 6.

In the motel room, Schenk was seen counting a thick stack of money.  He then made a phone call to arrange renting an apartment.  While Schenk was on the phone, Nolan joked with Goulding saying, " '[w]ouldn't it be funny if he got robbed[?]' "  Later, Nolan told Goulding how she had "hit licks" before.  Goulding understood this to mean Nolan had committed robberies.  Nolan also texted Goulding and joked about robbing Schenk.

Schenk drove Goulding, Briggs, and Nolan to International Boulevard to work.  Goulding and Nolan stayed together.  Between 7:00 p.m. and 9:00 p.m., at Nolan's suggestion, they went to a candlelight vigil.  Nolan met Ward, her boyfriend, at the vigil.  Goulding saw Nolan talking to Ward and two other men.

---

[2] Nolan was originally charged along with Ward as a codefendant on count one.  However, Nolan pleaded guilty to second degree murder before trial.  She is not a party to this appeal.

Goulding called Schenk for a ride. After Goulding and Nolan got back in Schenk's car, with Briggs, Nolan received two phone calls from potential "dates." Nolan agreed to meet the second caller at a Kentucky Fried Chicken on 73rd Avenue. When Nolan was dropped off, she told Goulding to take the first caller and instructed Schenk to drive to Favor Street and 73rd Avenue, and to park behind a white camper.

Schenk drove to Favor Street and pulled up behind the camper with the engine still running. Goulding saw three men wearing hooded sweatshirts walking by on the sidewalk. When the men got to the back of the car, one of them ducked down. Briggs told Schenk to "go." An individual Goulding recognized as Ward came around to the driver's side.

Ward hit Schenk's window with a gun. The gun had a long handle. It was not a handgun. The barrel was pointed at Schenk. Schenk looked up and tried to speed off, but the gun went off. When the car was moving, Goulding heard three or four more shots fired at the back of the car. Some bullets struck the car.

Schenk turned right onto 73rd Avenue and crashed. Schenk had been shot. Goulding called 911. Goulding was questioned by the police about the shooting. Initially, Goulding did not tell the police she was a prostitute or that Ward was the shooter. Because she was afraid of Ward, Goulding gave the police only a physical description. After Goulding spoke to the police, she received a threatening text from Nolan. In June 2012, Goulding was arrested for Schenk's murder. Goulding then identified Ward as the shooter because she did not want to go to jail for something "[she] had nothing to do with."

The Police Investigation

On October 5, 2011, at approximately 10:00 p.m., Oakland Police Officer Brian Kline responded to a 911 call of a shooting on 73rd Avenue in Oakland. At the scene, Kline saw a Buick that had collided with a parked vehicle. The driver of the Buick had gunshot wounds on his left side. Schenk was pronounced dead at 10:18 p.m.

The windshield of Schenk's car exhibited damage consistent with a shotgun blast, and bullet holes were found in the back of the car. On Favor Street, a police evidence

3

technician found a shotgun shell, a cell phone, and seven nine-millimeter casings. The next morning, on October 6, 2011, a homeowner on Favor Street reported finding a shotgun in the bushes in front of his house. Forensic testing showed that the shotgun shell obtained from Favor street was fired from the sawed-off shotgun found in the bushes. The seven casings were nine-millimeter Luger rounds. All seven were fired from the same gun.

Police Interviews of Ward and Nolan

On June 22, 2012, the police arrested Ward and Nolan and interviewed them separately. Ward first denied having being involved, but by the end of the interview, admitted that he shot Schenk. Following this confession, Ward was interviewed by representatives from the district attorney's office. The interview was recorded and played for the jury. Ward explained that, on the day in question, he "[p]ut the gun[s] on" in the morning. Ward admitted that he had attempted to rob Schenk at gunpoint and then shot Schenk when Schenk tried to drive away. Ward said he fired the sawed-off shotgun, which was on a shoestring around his neck, dropped it, and then "[p]ulled out the [nine-millimeter handgun] in my . . . waist . . . [a]nd started shooting." Ward said he "took off running," but left the shotgun in some bushes near a house at the scene. Ward took the handgun with him, but sold it in Oakland a "couple days" after the shooting.

*Defense Evidence*

The defense called no witnesses.

*Verdict and Sentence*

The jury convicted Ward of first degree murder with special circumstances and possession of a firearm by a felon. The jury also found all of the enhancement allegations true. Ward admitted the prior conviction allegations and was thereafter sentenced on count one to a term of life without the possibility of parole. The court imposed a consecutive six-year term for possession of a firearm by a felon (count two). Five additional years were imposed for the prior serious felony, for a total term of life without the possibility of parole, plus 11 years. Ward filed a timely notice of appeal.

## II.    DISCUSSION

Ward contends that the trial court erred in imposing a six-year consecutive sentence on count two. He argues that the sentence on count two should have been stayed pursuant to section 654. His argument is without merit.

Although Ward did not raise this argument at sentencing, we may nonetheless review it on appeal. "It is well settled . . . that the court acts in 'excess of its jurisdiction' and imposes an 'unauthorized' sentence when it erroneously stays or fails to stay execution of a sentence under section 654. [Citations.]" (*People v. Scott* (1994) 9 Cal.4th 331, 354, fn. 17.) An "unauthorized sentence" can be corrected whenever it is brought to the reviewing court's attention, even if no objection was made below. (*Ibid.*)

Section 654, subdivision (a) provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."

" ' "Section 654 has been applied not only where there was but one 'act' in the ordinary sense . . . but also where a course of conduct violated more than one statute and the problem was whether it comprised a divisible transaction which could be punished under more than one statute within the meaning of section 654." [Citation.] [¶] Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' [Citation.]" (*People v. Rodriguez* (2009) 47 Cal.4th 501, 507, italics omitted.)

"Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination. [Citations.] Its findings will not be reversed on appeal if there is any substantial evidence to support them. [Citations.] We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably

5

deduce from the evidence. [Citation.]" (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

"Whether a violation of [former] section 12021, forbidding persons convicted of felonies from possessing firearms concealable upon the person, constitutes a divisible transaction from the offense in which he employs the weapon depends upon the facts and evidence of each individual case. [Citation.] Thus where the evidence shows a possession distinctly antecedent and separate from the primary offense, punishment on both crimes has been approved. [Citations.] On the other hand, where the evidence shows a possession only in conjunction with the primary offense, then punishment for the illegal possession of the firearm has been held to be improper where it is the lesser offense. [Citations.]" (*People v. Venegas* (1970) 10 Cal.App.3d 814, 821 (*Venegas*).) "[S]ection 654 is inapplicable when the evidence shows that the defendant arrived at the scene of his or her primary crime already in possession of the firearm." (*People v. Jones, supra*, 103 Cal.App.4th at p. 1145.)

Our Supreme Court applied these rules in *People v. Bradford* (1976) 17 Cal.3d 8 (*Bradford*). In *Bradford*, the defendant robbed a bank and was stopped minutes later for speeding by a highway patrol officer. The defendant took the officer's revolver and began shooting. The defendant was convicted of both possession of a concealable firearm by a felon and assault with a deadly weapon on a peace officer. (*Id.* at p. 13.) Because the "[d]efendant's possession of [the] revolver was not 'antecedent and separate' from his use of the revolver in assaulting the officer," the court concluded that the defendant's sentence for possession of a firearm by a felon should be stayed pursuant to section 654. (*Id.* at pp. 22-23.)

This case is nothing like *Bradford* or *Venegas,* in which the defendants fortuitously came into possession of a gun only at the moment of the primary offense. (*Bradford, supra,* 17 Cal.3d at pp. 13, 22; *Venegas, supra,* 10 Cal.App.3d at p. 821.) Here, in contrast, Ward concedes that he possessed the shotgun and handgun when he arrived at the scene of the crime. However, he contends this is insufficient evidence supporting the punishment imposed "because . . . the homicide in this case was part of an

6

ongoing conspiracy involving [Nolan] and [Ward.] . . . [¶] . . . [¶] . . . And because we cannot tell if [Ward] had the gun *before* he and Nolan conspired to rob Schenk, there is no evidence establishing antecedent possession." (Italics added.)

The record, viewed in the light most favorable to the trial court's sentencing determination, indicates that Ward possessed the firearms before he and Nolan conspired to rob Schenk. Even if it did not, the evidence nonetheless suggests that Ward harbored separate and consecutive intents. There is substantial evidence that Ward held onto the nine-millimeter handgun until he sold it days after the shooting. Ward argues that this evidence is inconsequential because, in *Bradford, supra,* 17 Cal.3d at page 13, our Supreme Court found section 654 applicable despite "the defendant and his accomplice retain[ing] possession of the gun after the incident involving the officer." But, despite Ward's suggestion to the contrary, *Bradford* did not address an argument that the defendant retained constructive possession of the gun after firing it. (*Id.* at pp. 13, 22–23.) Opinions are not authority for propositions not considered. (*People v. Avila* (2006) 38 Cal.4th 491, 566.)

*People v. Ratcliff* (1990) 223 Cal.App.3d 1401 (*Ratcliff*) and *People v. Garcia* (2008) 167 Cal.App.4th 1550 (*Garcia*) are more on point. In *Ratcliff*, the defendant committed two armed robberies and was arrested later the same morning, with the loaded handgun in his possession. (*Ratcliff,* at pp. 1404–1405.) On appeal, the defendant challenged the consecutive term imposed for the felon in possession of a firearm conviction, contending that the term should be stayed, under section 654, "because the firearm use and being [a felon] in possession of a concealable firearm were part of a continuous transaction." (*Id.* at pp. 1407–1408.) The court rejected his argument, explaining: "[T]he crime is committed the instant the felon in any way has a firearm within his control. [¶] . . . [¶] In the instant case, the evidence showed that defendant used a handgun to perpetrate two robberies separated in time by about an hour and a half. He still had the gun in his possession when he was arrested half an hour later. Unlike in *Bradford* and *Venegas*, the defendant already had the handgun in his possession when he arrived at the scene of the first robbery. A justifiable inference from this evidence is that

7

defendant's possession of the weapon was not merely simultaneous with the robberies, but continued before, during *and after* those crimes. Section 654 therefore does not prohibit separate punishments." (*Id.* at pp. 1410–1413, italics added & omitted.)

In *Garcia, supra,* 167 Cal.App.4th 1550, the defendant committed two armed robberies and was arrested later the same day with the gun in his jacket. The defendant admitted he had considered, but decided against, initiating a firefight with the officers at the time of his arrest. (*Id.* at pp. 1555–1556, 1564.) The reviewing court concluded that section 654 did not preclude imposition of a concurrent sentence on the firearm possession by a felon charge. (*Id.* at pp. 1563–1566.) It reasoned: "The trial court could reasonably find this is not a situation involving the fortuitous possession of a handgun only at the moment of the commission of a crime apart from the mere act of firearm possession by a felon. Further, implicit in the trial court's concurrent sentencing order is the implied finding that [the] defendant's intent in possessing the firearm during the Arcadia robberies was different from that when he was stopped in El Monte and he contemplated the shootout with the arresting officers." (*Id.* at p. 1566.)

Here, just as in *Ratcliff* and *Garcia,* the trial court impliedly found that section 654 did not apply because Ward's possession was separate and independent from the primary offense. The trial court's implicit section 654 finding is supported by substantial evidence of Ward's possession of at least one firearm both before, during, and after the murder. The consecutive terms of punishment for possession and murder do not violate section 654.

8

### III.    DISPOSITION

The judgment is affirmed.


                                      _____

                                        Bruiniers, J.


We concur:


_____

Jones, P. J.


_____

Simons, J.