Filed 1/15/26  P. v. Smoot CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

|  |  |
|---|---|
| THE PEOPLE,<br><br>            Plaintiff and Respondent,<br><br>      v.<br><br>JOEL ALLEN SMOOT,<br><br>            Defendant and Appellant. | C100358<br><br>(Super. Ct. No. 23FE012095) |

A jury found defendant Joel Allen Smoot guilty of discharge of a firearm at an occupied building, burglary, possession of a firearm as a convicted felon, and grossly negligent discharge of a firearm.  The trial court imposed sentences on each of the counts and suspended execution of the sentence on the conviction for grossly negligent discharge of a firearm pursuant to Penal Code section 654.[1]

On appeal, Smoot challenges the sufficiency of the evidence supporting his convictions for burglary and grossly negligent discharge of a firearm.  He also contends

---

[1]  Undesignated statutory references are to the Penal Code.

1

that the inadvertent disclosure to the jury of an unredacted 911 call that was not admitted into evidence violated his Confrontation Clause rights and various provisions of the Evidence Code. He further asserts that section 654 applies to his convictions for discharging a firearm at an occupied building, burglary, and firearm possession. We conclude that sufficient evidence supports the challenged convictions, discern no prejudice in the mistaken disclosure of the unredacted 911 call, and determine that section 654 does not forbid multiple punishments for the challenged counts. We therefore affirm the judgment.

BACKGROUND

Smoot and victim P. Doe had a romantic relationship. One evening, Doe and three men, W.I., T.C., and D.C., were at Doe's house. Doe, W.I., and T.C. were inside the house, and D.C. was in the front yard. Smoot drove up to the house, got out of his car, and shot at the house. A shot hit the front door, destroying the glass. Smoot fired three shots outside and then entered the house. Inside, W.I. grabbed a metal pole, threw it at Smoot, and ran to a bedroom. Smoot pursued him and tried to kick down the bedroom door. Smoot fired two shots, one into the ceiling and one into the wall. He then ran out of the house, got into his car, and drove away.

Police found four shotgun shell casings, three outside the house and one in the living room. In the living room, they also found bird shot pellets in the ceiling.

The People charged Smoot with assault with a firearm as to W.I. (§ 245, subd. (a)(2); count one), discharge of a firearm at an occupied building (§ 246; count two), burglary of Doe's residence (§ 459; count three), possession of a firearm by a felon (§ 29800, subd. (a)(1); count four), and grossly negligent discharge of a firearm (§ 246.3; count five). The information did not specify the victims for counts two and five.

At trial, the prosecution introduced body camera footage from a police officer who interviewed W.I. at the time of the offense. In the footage, W.I. described the sequence

2

of events above, saying that he was standing in the doorway when Smoot fired at the house. W.I. said that Smoot was shooting "[a]t us! I don't know who he was shooting at, but whoever he was shooting at, he did not get nowhere near 'em."

When W.I. testified at trial, he denied that Smoot ever came to Doe's house, fired a gun at him, or chased him inside. W.I. testified that he did not recall making any statements to police to that effect, saying, "There was no Mr. Smoot there. I don't know where you guys are getting there. [¶] . . . All right. So, can I go now? I'm over this."

W.I. additionally testified that he would be at "[Doe's] house" "[o]ff and on." When asked, "Mr. Smoot, did he live there?" W.I. responded, "Not that I recall." He explained that Doe was Smoot's wife. He was then asked again, "But Mr. Smoot didn't live at the house?" W.I. again responded, "Not that I recall." W.I. also did not recall whether Doe and Smoot held themselves out as husband and wife and did not remember ever seeing them act affectionately toward each other in the approximately two years he had known them. He did not recall knowing the nature of their relationship.

T.C. testified that he and Doe had previously dated and remained friends. He said he had no idea where Smoot was living around the time of the shooting. On the day of the offense, T.C. was replacing siding on the house, which was owned by Doe's father. D.C. was painting the house. T.C., D.C., and W.I. all were at the house that evening. As T.C. was getting ready to leave, he heard a gunshot ring out, then a second shot shattered the glass door. T.C. ran out back to get his nail gun and heard a third shot, then saw Smoot running, getting into his car, and driving away. T.C. called 911 when he saw D.C. face down and bleeding. T.C. later learned that D.C. had not been shot but had injured himself after tripping and falling.

During T.C.'s testimony, the People played the first four minutes ten seconds of his call to 911, and that excerpt was admitted into evidence. The full, unredacted version of the call was marked, but was not admitted into evidence.

3

In the admitted portion of the call, T.C. said that Smoot pulled up to the house, yelled at someone, and fired five or ten shots. T.C. described D.C.'s injuries and told the dispatcher the direction in which Smoot had fled. T.C. also relayed information about Smoot's car and birthday. When describing Smoot, he said, "It's the homeowner[']s ex-boyfriend I guess, or husband I guess." The dispatcher asked, "The homeowner's ex-husband?" T.C. responded, "Yeah." He then put Doe on the phone to speak with the dispatcher. T.C. testified that he "was in panic mode" when he made the call. He also explained that he was relaying information, such as Smoot's birthday and vehicle information, from what other people were telling him contemporaneously.

The jury also heard a recording of a call between Smoot and Doe while Smoot was in jail. In the call, Smoot said, "I'm sorry. Are we okay?" Doe responded, "I don't know babe. Yeah, for now, I mean for now." Smoot said, "No matter how crazy we are, we're still together[,] we're still married. You know your mom was (unintelligible) just as much as I am," and Doe responded, "I know." Smoot complained that Doe had not spoken to the district attorney's office, telling her, "If you can't help me with this, then tell me now, fucking don't want to be with me no more, I'll fucking fight the case my own way." Doe said, "I can't neither. I don't have any friends. I don't have any friends." Smoot responded, "Okay, whatever. You chose to fucking push me away. [¶] . . . And I know you got [W.I.] over there." Doe replied, "You chose – you chose to push you away" and denied W.I. was at the house. Smoot said, "Nevermind, I'm not about to get into it. You can have whoever the fuck you want there." He accused Doe of not loving him, and Doe replied, "Babe, look what you did to my fucking house!" Smoot responded, "Hey! No. No. You're about to get me in trouble," and hung up.

Doe did not testify at trial.

In closing argument, Smoot's counsel argued that "the People's case is built on the statement of [W.I.] that he gave to the police being the truth." But "witnesses lie. And in this case witnesses lied. [¶] These witnesses that were in this case, they had lies from the

4

origin, to on the stand, to everywhere, and every opportunity they made up stuff." As to the burglary charge, defense counsel emphasized that W.I. was "the only person who puts the suspect inside" the house, and W.I. had prior felony convictions and should not be believed. Counsel did not argue that Smoot had the right to enter Doe's residence.

The trial court instructed the jury on the burglary charge using CALCRIM Nos. 1700 and 1701. Smoot did not request any pinpoint instruction as to that charge.

The jury found Smoot guilty of discharging a firearm at an occupied building (count two), burglary of Doe's residence (count three), possession of a firearm by a felon (count four), and grossly negligent discharge of a firearm (count five). As to the burglary count, the jury found true allegations that a person other than an accomplice was present in the residence at the time of the burglary and that Smoot was armed with or used a weapon in the commission of the crime. The jury could not reach a verdict on the assault charge (count one), and the trial court declared a mistrial as to that count.

The trial court imposed an aggregate sentence of six years four months, consisting of five years for the discharging a firearm at an occupied building count; one year four months (one-third the middle term) for the burglary conviction; two years, concurrent, for possession of a firearm; and two years for the grossly negligent discharge of a firearm conviction, stayed under section 654.

Smoot filed a timely notice of appeal.

DISCUSSION

I.

Smoot contends that his convictions for burglary (count three) and grossly negligent discharge of a firearm (count five) are supported by insufficient evidence.

" 'In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one. " 'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the

5

evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " ' [Citation.] ' " 'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.' " ' " (*People v. Alvarez* (2025) 18 Cal.5th 387, 470.)

A.

With respect to his burglary conviction, Smoot maintains that there was insufficient evidence to prove that he lacked the right to enter the home of Doe, his spouse. We disagree.

Burglary is the entry into a building "with intent to commit grand or petit larceny or any felony." (§ 459.) A burglary is an entry that "invades a possessory right in a building" and "must be committed by a person who has no right to be in the building." (*People v. Gauze* (1975) 15 Cal.3d 709, 714.) That means a "defendant cannot be guilty of burglarizing his own home." (*Ibid.*) In cases involving a putatively shared or family residence, "the People must prove that a defendant does not have an unconditional possessory right to enter." (*People v. Davenport* (1990) 219 Cal.App.3d 885, 892.) Courts have found no unconditional possessory right to enter a home where, for example, a person has moved out of the home. (*People v. Ulloa* (2009) 180 Cal.App.4th 601, 609 [no possessory interest where the defendant and victim were "estranged and separated due to having serious marital problems"]; *People v. Gill* (2008) 159 Cal.App.4th 149, 161 [no possessory interest where "the occupants of the family home were estranged, there had been prior threats to the safety of the victim and there had been incidents of spousal abuse . . . [, and the] victims feared for their safety"].)

There was sufficient evidence here that Smoot lacked an unconditional right to enter the home. In the recorded jail call with Smoot, Doe referred to the house as "*my* fucking house"—not "our" house—and their phone exchange made clear that their

6

relationship was estranged. (Italics added.) In addition, when W.I. was asked, "Mr. Smoot, did he live there?" he responded, "Not that I recall." He repeated that same answer when pressed by the prosecutor as to Smoot's relationship with Doe; and he did not object to the characterization of the house as "[Doe's] house." In addition, T.C. told the 911 dispatcher that Smoot was Doe's "ex-husband." All of this evidence supported a finding that Smoot did not live in the home and lacked an unconditional right to enter. Smoot argues that W.I.'s and T.C.'s statements are ambiguous and can be interpreted as meaning that W.I. did not recall *whether* Smoot lived at the house and that T.C. was simply unsure about the couple's relationship. But even if these are possible interpretations of the statements, " 'when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the jury.' " (*People v. Castro* (2006) 138 Cal.App.4th 137, 140.) Smoot also points to W.I.'s testimony that W.I. performed gardening work for both Doe and Smoot at the house, W.I.'s statement that he shared meals with them there, Doe's use of affectionate language on the recorded jail call with Smoot, and other references to the couple as being married. On review for substantial evidence, however, we decide only whether there was sufficient evidence to sustain the jury's verdict, not whether there was evidence that could support a different conclusion. (*People v. Riley* (2015) 240 Cal.App.4th 1152, 1165-1166.) Given the evidence adduced at trial, a reasonable trier of fact could find that Smoot lacked an unconditional possessory right to Doe's house. Smoot's substantial evidence challenge to his burglary conviction therefore fails.

B.

With respect to the grossly negligent discharge of a firearm conviction (count five), Smoot argues there was insufficient evidence that his firing of his gun into the ceiling would create a risk of death or injury. Again, we disagree.

The elements of a grossly negligent discharge of a firearm charge are " '(1) the defendant unlawfully discharged a firearm; (2) the defendant did so intentionally; [and]

7

(3) the defendant did so in a grossly negligent manner which could result in the injury or death of a person.' " (*People v. Overman* (2005) 126 Cal.App.4th 1344, 1361; see § 246.3.) To satisfy the third element of the statute, the prosecution need not show that "an actual person [was] in proximity to the grossly negligent shooting." (*People v. Ramirez* (2009) 45 Cal.4th 980, 986-987.) Rather, the "risk element requires the likely presence of people in the area, not the actual presence of a specific person." (*Id.* at p. 987.) The prosecution need only establish that it was "reasonably foreseeable that human injury or death might result under the circumstances." (*Id.* at p. 990.)

Here, the evidence at trial showed that Smoot shot his firearm in the presence of other people. When Smoot fired his gun in the living room, at least Doe and W.I. were inside the house. That evidence was sufficient for the jury to conclude that injury or death was reasonably foreseeable. (*People v. Overman*, *supra*, 126 Cal.App.4th at p. 1363 [defendant "fired his rifle in the general vicinity of several persons"].) Smoot emphasizes that no one was in the direct line of fire and that other potential scenarios of harm to particular victims were implausible. But as *Ramirez* explained, "[n]o one knows where shots fired recklessly into the air are likely to land," and "the Legislature did not intend to require proof that a given person was actually . . . endangered." (*People v. Ramirez*, *supra*, 45 Cal.4th at p. 990, italics omitted.) Sufficient evidence supported Smoot's conviction for grossly negligent discharge of a firearm.

## II.

Smoot next asserts that the judgment must be reversed because the jury was exposed to prejudicial and unconfronted hearsay statements contained in Exhibit 8, a transcript of the entire, unredacted 911 call, which was inadvertently delivered to the jury room during deliberations. He claims that the mistaken disclosure violated his rights under the Sixth Amendment's Confrontation Clause and Evidence Code sections 352, 1101, and 1200.

8

A.

Before trial, the People asked the trial court to admit the recording of the entire 911 call that T.C. made immediately after Smoot fled the scene. Smoot agreed that the beginning portions of the call were admissible under Evidence Code section 1240 as spontaneous statements, but argued that later portions were inadmissible because T.C. seemed to be relaying information from Doe and others to the 911 dispatcher. The court agreed that the later portions of the call included relayed statements from unidentified speakers, and it was unclear whether the speakers had personally perceived the events they were describing. The court permitted the People to play the portions of the 911 call that did not have "people in the background that have not been identified."

At trial, the People played only the first four minutes ten seconds of the 911 call, which was designated Exhibit 4/4-A. The full version of the call, Exhibit 8, was marked but not admitted.

As relevant here, Exhibit 8 included two exchanges that were not part of Exhibit 4. First, the 911 dispatcher asked T.C. where Smoot lived, and T.C. replied, "Joel doesn't live anywhere. He goes – there's a shop down on Roseville Road – you know the address? Well when the cops come here we can show the cops. I don't have an exact address where he's at, but I know where it's at." Second, T.C. handed the phone to Doe, and the dispatcher asked, "Has your ex-husband done anything like this before?" to which Doe replied, "No." The dispatcher then said, "Okay. Is there a history of domestic violence with you guys?" Doe replied, "Um, there is one. Once before, a couple weeks ago but I didn't press charges."

About two hours into the jury's deliberations, at about 4:30 p.m., the jury sent the trial court a request for the transcript of the 911 call and asked, "We want to know if we can consider the whole call as evidence or only a part and if only part where should we stop?" The court, concerned that the wrong version of the call had been sent to the jury room, asked the bailiff to check the exhibits. The bailiff found that both exhibits had

9

been inadvertently delivered to the jury room and retrieved Exhibit 8. The court then sent a response to the jury's question, saying: "The evidence of the 911 call is contained on People's [E]xhibit 4/4-A. The court reporte[r] did not transcribe the call. The entire 911 call contained on People's Exhibit 8 was erroneously sent in to the jury with the other exh[i]bits. If that exhibit was listened to, please disregard anything additional that was not presented in court and only consider People's Exhibit 4/4-A."

The next day, defense counsel moved for a mistrial based on the accidental disclosure. The court denied the motion. The court reasoned that the inadvertently disclosed statements of T.C. could properly have been presented to the jury and in any event were not particularly prejudicial to the defense. Doe's statement about a prior incident of domestic violence was "arguably prejudicial," but only minimally so and not to such an extent that the jury would be unable to follow the court's instruction to disregard the evidence. The court noted that the jury was already aware that Smoot was prohibited from possessing a firearm, and Doe's statement made clear that the history of domestic violence was limited to a single incident in which she did not press charges. Moreover, the jury's question to the court asking whether it was permitted to consider the transcript of the entire call was strong evidence that jurors were following the court's instructions. Accordingly, the mistakenly disclosed statement was not "so prejudicial that [the jurors] are not able to put it out of their mind and continue their deliberations."

B.

The parties agree that Exhibit 8 should not have been provided to the jury, but they disagree about the nature of the trial court's error. Smoot maintains that the inadvertent delivery of the exhibit to the deliberating jury not only reflected state-law error under Evidence Code sections 1101, 1200, and 352, but also violated his federal Sixth Amendment right to confront the witnesses against him. The People argue that the disclosure did not infringe Smoot's Confrontation Clause rights because the exhibit was never admitted into evidence; in their view, the mistake was state-law error alone.

10

We need not resolve this dispute because, even assuming the error was of federal constitutional dimension, there was no prejudice. " ' "Confrontation clause violations are subject to federal harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24," ' " which asks whether it is " 'clear beyond a reasonable doubt that a rational jury would have reached the same verdict absent the error.' " (*People v. Livingston* (2012) 53 Cal.4th 1145, 1159.) We conclude that the error here was harmless beyond a reasonable doubt.

To begin with, the trial court expressly instructed the jury to disregard the contents of Exhibit 8. We presume the jury followed this instruction. (*Tennessee v. Street* (1985) 471 U.S. 409, 415, fn. 6 ["assumption that jurors are able to follow the court's instructions fully applies when rights guaranteed by the Confrontation Clause are at issue"]; *People v. Alexander* (2010) 49 Cal.4th 846, 914-915 [witness statement that the defendant committed prior triple murder cured by trial court admonition].)

Doe's statement concerning a prior act of domestic violence also was not so inflammatory or prejudicial that the jury would be unable to set it aside as instructed. Her limited statement made only vague reference to a single incident of domestic violence. The charged offenses, moreover, were supported by specific evidence of Smoot's abusive conduct. Overwhelming evidence showed that Smoot, who had previously been in a romantic relationship with Doe, drove up to her residence, fired a shotgun, entered her house, and continued to shoot once inside. After the crime, Smoot expressed jealousy, accusing Doe of "fucking push[ing] [him] away" and having another man (W.I.) at her home. Given this evidence, Doe's limited statement to the 911 dispatcher would not have tipped the balance or suggested Smoot was a perpetrator of domestic violence in a way that the admissible evidence had not. (See *People v. Roberts* (2021) 65 Cal.App.5th 469, 477, 479 [victim statement that the defendant "whipped her three or four times with a belt and had been violent with her in the past"

11

harmless under *Chapman* where overwhelming evidence showed the defendant hit the victim with a belt].)

The jury's exposure to T.C.'s statements suggesting Smoot was living elsewhere and had no right to enter Doe's home was harmless as well. As we have explained, there was sufficient other evidence to conclude that Smoot lacked an unconditional possessory right to enter the residence, including the admissible portion of the 911 call in Exhibit 4, the call between Doe and Smoot from jail, and W.I.'s testimony. Accordingly, any other evidence on this subject was cumulative and harmless. (*People v. Ledesma* (2006) 39 Cal.4th 641, 709 [admission of evidence in violation of Confrontation Clause harmless beyond a reasonable doubt where "it was cumulative of other evidence"]; *People v. Livingston*, *supra*, 53 Cal.4th at p. 1159 [same].) In sum, we are satisfied beyond a reasonable doubt that the inadvertent disclosure of Exhibit 8 did not contribute to the verdict.

III.

Last, Smoot argues that the trial court committed two sentencing errors under section 654. First, he contends that the court misapplied the statute by imposing and executing sentences on his convictions for both discharging a firearm at an occupied building and burglary (counts two and three). Second, he claims the court should have stayed the sentence for unlawful possession of a firearm (count four). We reject both contentions.

A.

At the sentencing hearing, the trial court discussed section 654 and its application to Smoot's convictions. The court said: "Count 2 involved facts of Mr. Smoot shooting from outside the home towards the front door of the home where the victim was standing. [¶] Count 5 is a separate and distinct shooting act after Mr. Smoot entered the home and then shot a firearm up into the ceiling of the home. So the Court does not find that those

12

are 654 to each other in that they are separate and distinct acts of violence with a separate intention.

"However, the Court does find that Counts 3 and . . . 5 do invoke the principles of Penal Code Section 654. The People's theory that was set forth to the jury with regard to Count 3, which is the burglary, was that Mr. Smoot entered the home with the intent to commit an assault with a firearm. The jury did not find Mr. Smoot guilty of that charge; however, they did find Mr. Smoot guilty of Count 5 which is the 246.3. Although not an assault with a firearm, the Court finds that that is essentially fault in the category of what was the intent of the Penal Code [section] 459 when Mr. Smoot entered the residence was to commit some kind of assault or act with the firearm which was encompassed in Count 5. So I would find that Count 3 and Count 5 would be 654 to one another."

After hearing from the parties, the trial court continued: "[T]he Court does find [that] 654 should not apply to Counts 2 and 3. The objectives are different. There are – Count 3 requires a very specific intent. Certainly these crimes could have been done independent of one another. Mr. Smoot could have fired the weapon into the home and then left, but he didn't. He fired a weapon into the home and then continued to commit additional criminal acts by entering the home with the intention to try and complete the assault with a firearm. So the Court does not find that 654 is applicable to Counts 2 and 3. They are different and distinct criminal actions with different intents and different victims. I would not find that 654 would apply to those either."

B.

Section 654, subdivision (a) provides in relevant part: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." The statute thus " ' "precludes multiple punishment for a single act or for a course of conduct comprising indivisible acts. 'Whether a course of criminal conduct is divisible . . . depends on the intent and objective of the actor.' [Citations.] '[I]f all the

13

offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, [the] defendant may be found to have harbored a single intent and therefore may be punished only once.' " ' " (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143 (*Jones*).) "However, if the defendant harbored 'multiple or simultaneous objectives, independent of and not merely incidental to each other, the defendant may be punished for each violation committed in pursuit of each objective even though the violations share common acts or were parts of an otherwise indivisible course of conduct.' " (*Ibid.*)

"The defendant's intent and objective present factual questions for the trial court, and its findings will be upheld if supported by substantial evidence. [Citation.] 'We review the court's determination of [a defendant's] "separate intents" for sufficient evidence in a light most favorable to the judgment, and presume in support of the court's conclusion the existence of every fact the trier of fact could reasonably deduce from the evidence.' " (*People v. Andra* (2007) 156 Cal.App.4th 638, 640-641.)

C.

Smoot claims that the discharge of a firearm at an occupied building conviction (count two) and the burglary count (count three) arose out of the same course of conduct because each offense shared the same objective: the assault of W.I. We conclude that the trial court did not err in imposing and executing sentences on both counts because the offenses involved crimes of violence directed at different victims.

"The section 654 proscription against multiple punishment does not apply to violations arising from an indivisible course of conduct if during the course of that conduct the defendant committed crimes of violence against different victims. [Citations.] 'The purpose of the protection against multiple punishment is to insure that the defendant's punishment will be commensurate with his criminal liability. A defendant who commits an act of violence with the intent to harm more than one person or by a means likely to cause harm to several persons is more culpable than a defendant

14

who harms only one person.' " (*People v. Masters* (1987) 195 Cal.App.3d 1124, 1127-1128; *People v. Anderson* (1990) 221 Cal.App.3d 331, 339 ["Because each violent offense involved at least one different victim, multiple punishment was not precluded"]; *People v. Cruz* (1995) 38 Cal.App.4th 427, 434 [assault and discharging a firearm at an occupied building separately punishable because firearm crime also victimized " 'children and other people' " who were near the assault victim at the time of the shooting].)

Smoot acknowledges that section 654 does not forbid multiple punishments for violent crimes involving multiple victims. He likewise does not dispute that both counts two and three were "crimes of violence" for the purposes of the section 654 analysis. He argues that imposing and executing sentences on both counts was nevertheless error because the victims of both crimes were the same. We are not persuaded. The information does not specify the victims of the shooting at an occupied building count. (See *People v. Centers* (1999) 73 Cal.App.4th 84, 101 [named victims in information sufficient, but not necessary, to apply multiple victim exception].) But W.I. told a police officer at the scene that Smoot was shooting "[a]t us! I don't know who he was shooting at, but whoever he was shooting at, he did not get nowhere near 'em." D.C. was out in front of the house, and Doe, W.I., and T.C. were inside. When Smoot fired the shotgun at Doe's residence, the victims thus included Doe, D.C., W.I., and T.C. Neither D.C. nor T.C. could be considered victims of the burglary, however, because neither lived at the house, and Smoot did not enter intending to assault either one of them. (See *id.* at pp. 101-102 [resident of home and target of underlying kidnapping felony were the victims of burglary crime].) D.C. was outside the house when Smoot arrived and injured himself; T.C. ran out of the house to the back porch and was not inside the house at the same time as Smoot. Substantial evidence thus supports the trial court's conclusion that these crimes involved different victims, and the trial court therefore did not err when it imposed and executed separate sentences for counts two and three.

15

D.

Smoot additionally argues that the two-year concurrent sentence for his possession of a firearm conviction (count four) should have been stayed under section 654 because the only evidence of his firearm possession was that he brought a firearm to commit the other offenses. The People concede the point, relying on *People v. Venegas* (1970) 10 Cal.App.3d 814. We decline to accept the People's concession and conclude that substantial evidence supports the trial court's implied finding that the possession offense could be punished separately.

"Case law establishes the guidelines for applying section 654 in the context of a conviction for possession of a prohibited weapon. ' "[W]here the evidence shows a possession distinctly antecedent and separate from the primary offense, punishment on both crimes has been approved. On the other hand, where the evidence shows a possession only in conjunction with the primary offense, then punishment for the illegal possession of the [weapon] has been held to be improper where it is the lesser offense." ' " (*People v. Wynn* (2010) 184 Cal.App.4th 1210, 1217.)

In *Venegas*, the defendant was convicted of assault with a deadly weapon and possession of a firearm as a convicted felon after he was involved in a fight and shot the victim. (*People v. Venegas*, *supra*, 10 Cal.App.3d at pp. 817-819.) There was evidence that the defendant struggled for a gun that someone else was holding before he shot the victim. (*Id.* at pp. 819-820.) The Court of Appeal concluded that section 654 proscribed multiple punishments, reasoning that "the evidence show[ed] a possession only at the time [the] defendant shot" the victim. (*Id.* at p. 821; see also *People v. Bradford* (1976) 17 Cal.3d 8, 22-23 [section 654 applies in assault with a deadly weapon and possession of a firearm by a felon case where the defendant wrested away the gun of a highway patrol officer and shot at the officer with the gun].)

In contrast, in *Jones*, the defendant was convicted of shooting at an occupied dwelling and possession of a firearm as a felon after he drove past his ex-girlfriend's

16

house and fired several shots, shortly after he and an accomplice had gone to the house and asked to speak to the ex-girlfriend. (*Jones*, *supra*, 103 Cal.App.4th at pp. 1141-1142.) Finding multiple punishments appropriate, the Court of Appeal concluded that "[i]t strains reason to assume that [the defendant] did not have possession for some period of time before firing shots at [the victim's] home. Any other interpretation would be patently absurd. [The defendant] committed two separate acts: arming himself with a firearm, and shooting at an inhabited dwelling. . . . It was therefore a reasonable inference that [the defendant's] possession of the firearm was antecedent to the primary crime." (*Id.* at p. 1147; see also *People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1413-1414 [multiple punishments permitted for possession of a firearm and robbery crimes where "the defendant already had the handgun in his possession when he arrived at the scene of the first robbery"].) *Jones* also distinguished *People v. Bradford*, *supra*, 17 Cal.3d 8, and *People v. Venegas*, *supra*, 10 Cal.App.3d 814, which the parties cite, observing that, unlike in those cases, "the evidence was not susceptible to a conclusion that [the defendant] fortuitously came into possession of the gun at the moment he drove by [the victim's] house." (*Jones*, at p. 1148.)

Here, *Jones* is more on point. Smoot arrived at Doe's house in his car and immediately fired a shotgun at the house. As in *Jones*, Smoot "arrived at the scene of his . . . primary crime already in possession of the firearm," and nothing suggests that he "fortuitously came into possession" of the shotgun when he arrived. (*Jones*, *supra*, 103 Cal.App.4th at pp. 1145, 1148.) It was thus reasonable for the trial court to infer that Smoot was already armed and that the possession offense was complete before he fired at the house. Accordingly, section 654 did not preclude separate punishment for the possession of a firearm offense.

17

DISPOSITION

The judgment is affirmed.

/s/
FEINBERG, J.

We concur:

/s/
DUARTE, Acting P. J.

/s/
RENNER, J.

18